STATE OF NORTH CAROLINA v. JOHN ELWIN MISENHEIMER

No. 117

(Filed 6 October 1981)

**1. Homicide § 4.3— murder committed during quarrel—intent to kill—deliberation**

A killing committed during the course of a quarrel or scuffle may constitute first degree murder provided the defendant formed the intent to kill in a cool state of blood before the quarrel or scuffle began and the killing during the quarrel was the product of this earlier formed intent. If, however, the killing was the product of a specific intent to kill formed under the influence of the provocation of the quarrel or struggle itself, then there would be no deliberation and hence no murder in the first degree.

State v. Misenheimer

2. **Homicide § 21.5— killing during struggle—prior intent to kill—first degree murder**

   In a prosecution of defendant for the murder of his father which occurred after defendant and his father had engaged in a struggle and his father had twice "grabbed" defendant, the jury could properly find that the killing was the product of an earlier formed specific intent to kill rather than an intent formed under the influence of the provocation of the struggle and that defendant was guilty of first degree murder where there was evidence tending to show that defendant had repeatedly told his siblings that his father was trying to poison him; defendant had threatened to kill his father on at least one previous occasion; approximately one month before the killing defendant told his sister "he'd never have peace" as long as his father was alive; on the day of the killing defendant entered a shed on his father's property, loaded a rifle, and tucked it under his belt where it was hidden by his jacket; defendant then entered his father's home, but did not confront his father until his sister had gone to work; defendant's father was unarmed and aware of previous threats made by defendant against him; the only struggle resulted from the father's efforts to disarm defendant; after the shooting defendant acted dispassionately; and when questioned by police officers later that day, defendant coherently and calmly related his actions of that day and told the officers that he carried a gun into his father's home because his father had attempted to poison him previously and because his father was involved in communist activity in the area.

3. **Criminal Law § 75.14— mental capacity to confess voluntarily**

   The evidence on voir dire did not compel a conclusion that defendant lacked sufficient mental capacity to confess voluntarily to the murder of his father and supported the trial court's determination that defendant's confession was made freely, voluntarily and understandingly where there was evidence tending to show that, although defendant had experienced psychiatric problems in the past and apparently entertained delusions about his father, he was able to function independently of supervision by medical personnel and family members in the weeks prior to the killing and the confession; defendant was found competent to stand trial after a psychiatric evaluation conducted shortly after his arrest; defendant was informed of his *Miranda* rights and appeared to understand them; defendant appeared to be coherent at the time of questioning and not under the influence of drugs other than prescribed medication; the questioning itself was conducted in a well-lighted conference room in less than two hours; and defendant's various statements during the questioning and afterwards were consistent.

4. **Criminal Law § 86.8— sibling witnesses—cross-examination about hiring a private prosecutor—exclusion of further cross-examination**

   In this prosecution of defendant for first degree murder of his father wherein the trial court permitted defense counsel to ask brothers and sisters of defendant on cross-examination whether they were among family members who had employed a private prosecutor, the trial court did not err in refusing to permit further cross-examination of defendant's siblings concerning their motives for hiring the private prosecutor since the jury could infer bias of the witnesses from their admissions that the family was represented by a private

State v. Misenheimer

prosecutor. Furthermore, even if defendant was entitled to cross-examine the sibling witnesses to show that they had a pecuniary motive for hiring a private prosecutor in that they would inherit a greater portion of their father's estate if defendant were disqualified as an heir by reason of his conviction for his father's murder, no prejudice to defendant appears because of the trial court's refusal to permit such cross-examination since the record fails to show what the witnesses would have testified in this regard, and since defendant could have read the statutes relating to this issue to the jury and argued the bias which the statutes might have engendered in the sibling witnesses.

5. **Bills of Discovery § 6— defendant's statements to his brothers—noncompliance with discovery request—admission as harmless error**

Even if defendant's brothers were officers of the State because they had hired a private prosecutor and statements made to them by defendant were thus discoverable under G.S. 15A-903(a)(2), there was no merit to defendant's contention that admission of the statements was erroneous on the ground that the State failed to supply the statements pursuant to defendant's request for discovery where the record shows that the prosecutor learned of the details of the statements only the night before a voir dire hearing at the beginning of the trial and that he satisfied his continuing duty to disclose by putting defense counsel on notice of the statements both before and during the voir dire hearing. Furthermore, even if the State failed to meet its obligation to disclose, defendant was not prejudiced thereby since he made no motions for relief under G.S. 15A-910, and since the decision whether to admit evidence not disclosed during discovery was discretionary with the trial court and no abuse of discretion has been shown.

6. **Homicide § 27.2— instructions on involuntary manslaughter—use of "unlawful" rather than "unintentional" killing—harmless error**

Defendant was not prejudiced by the court's instruction defining involuntary manslaughter as the "unlawful" rather than the "unintentional" killing of a human being by an unlawful act not amounting to a felony, or an act done in a criminally negligent way, where the court thereafter applied the correct legal standard in another portion of the charge and in the final mandate, and where there was no basis for submitting involuntary manslaughter to the jury and defendant was convicted of first degree murder.

7. **Constitutional Law § 48— effective assistance of counsel—failure to renew motion to dismiss**

A defendant charged with first degree murder was not denied the effective assistance of counsel by failure of his trial counsel to renew his motion to dismiss at the close of all the evidence since the failure to renew the motion to dismiss did not preclude appellate review of the sufficiency of all the evidence, G.S. 15A-1227(d), and since defendant presented no evidence and a renewal of the motion would thus have been futile.

8. **Constitutional Law § 48— effective assistance of counsel—failure to present evidence in defendant's behalf**

A defendant charged with the first degree murder of his father was not denied the effective assistance of counsel by the failure of his trial counsel to

present defendant as a witness where the record shows that the decision not to testify at trial was clearly defendant's own. Nor was defendant denied the effective assistance of counsel by the failure of his trial counsel to offer any psychiatric testimony about his mental condition absent some showing that evidence of defendant's insanity was available or by the exercise of due diligence could have been developed by counsel and presented in defendant's behalf.

BEFORE *Judge Claude S. Sitton*, presiding at the 13 October 1980 Criminal Session of MECKLENBURG Superior Court, and a jury, defendant was found guilty of murder in the first degree. Upon being sentenced to life imprisonment[1] defendant appeals of right pursuant to G.S. 7A-27(a). This case was argued as No. 133, Spring Term 1981.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the state.*

*Hasty, Waggoner, Hasty, Kratt & McDonnell, by Robert D. McDonnell, for defendant appellant.*

EXUM, Justice.

In this appeal defendant brings forth assignments of error relating to the trial court's refusal to: dismiss the charge of first degree murder for insufficient evidence, suppress defendant's incriminating statements, permit cross-examination of several witnesses on their motivation for hiring a private prosecutor. He also presents assignments relating to portions of the trial judge's substantive instructions to the jury and his contention that he suffered from ineffective assistance of counsel. After careful examination of each assignment of error we conclude that defendant's trial was free from prejudicial error.

The state's evidence tends to show the following: In the Spring of 1980 defendant was a thirty-six-year-old man who had experienced psychiatric problems and treatment over a period of

---

1. The state announced at the beginning of defendant's trial that there was no evidence of an aggravating circumstance as delineated in G.S. 15A-2000(e). Therefore, the state chose not to prosecute the first degree murder charge as a capital case. Because the state failed to produce evidence of any aggravating circumstance, the trial court properly imposed a sentence of life imprisonment without the intervention of the jury. *See State v. Johnson*, 298 N.C. 47, 79-80, 257 S.E. 2d 597, 620 (1979).

years. In 1976 he had been involved in a commitment proceeding for threatening to kill his father with a knife. He had expressed his belief that his father was trying to poison him a number of times over a span of four to five years. In May of 1980 he told his sister, Sylvia, that as long as his father was alive "he'd never have peace."

On 10 June 1980 defendant arrived at his father's residence about 8:00 a.m., while his father was cooking breakfast and his sister, Sharon, was preparing for work. Defendant, rather than enter the residence, went to a shed on the property and ate some food he had purchased at a local restaurant. While in the shed he took an old rifle with the stock removed, loaded it with a single cartridge, and tucked the gun under his belt in the front of his pants. A jacket covered the gun from view. He entered the trailer, remaining in a back bedroom where he was heard but not seen by Sharon before she left for work. He then went into the kitchen where his father was preparing breakfast and told his father he wished to speak with him. His father, sixty-seven years old, but somewhat larger than defendant, spotted the gun and "grabbed for it or grabbed at" defendant. Defendant pulled away. His father grabbed him again. Defendant then reached for the gun, turned, and shot his father in the forehead from a distance of one foot. Defendant left the residence and drove to his brother's home. Because his brother was not at home, he waited briefly, then decided to drive to South Carolina to help Sylvia, who was in the process of moving.

Sharon returned home shortly after 11:00 a.m. and discovered her father's body on the floor next to the kitchen table. The breakfast utensils were on the table and pans were still on the burners of the stove.

No one other than the deceased and defendant witnessed the shooting; thus the state relied on statements made by defendant to police officers and family members. Defendant met Sylvia in Dillon, South Carolina, and was subsequently detained by the Dillon County Sheriff's Department. About 7:30 p.m. defendant was questioned by two officers of the Mecklenburg County Police Department. After being informed of his *Miranda* rights, he waived his right to counsel, and gave a statement of his activities that day. During the course of questioning by the officers he told

them that he had gotten the firearm from the shed because some communists, including his father, had been causing trouble in his father's trailer park, and because his father had previously attempted to poison him. He also complained to the officers that a laser light was coming through the window of the conference room where he was being questioned, but neither officer could see any light.

In a pre-trial psychiatric evaluation defendant was found competent to stand trial. He presented no evidence at trial.

I

Defendant assigns as error the submission of first degree murder to the jury, contending that the evidence, when viewed most favorably to the state, was insufficient to constitute first degree murder. We disagree.

[1] First degree murder is the unlawful killing of a human being with malice, premeditation and deliberation. *State v. Davis*, 289 N.C. 500, 223 S.E. 2d 296, *death sentence vacated*, 429 U.S. 809 (1976); G.S. 14-17 (Cum. Supp. 1979). Generally, premeditation and deliberation must be proved by circumstantial evidence because they "are not susceptible of proof by direct evidence." *State v. Love*, 296 N.C. 194, 203, 250 S.E. 2d 220, 226-27 (1978). Premeditation means that defendant formed the specific intent to kill the victim for some period of time, however short, before the actual killing. Deliberation means that the intent to kill was formed while defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation. *State v. Biggs*, 292 N.C. 328, 337, 233 S.E. 2d 512, 517 (1977); *State v. Hamby*, 276 N.C. 674, 678, 174 S.E. 2d 385, 387 (1970), *death sentence vacated*, 408 U.S. 937 (1972). The term "cool state of blood" does not, in the context of determining the existence of deliberation, mean "an absence of passion and emotion. . . . '[A]lthough there may have been time for deliberation, if the purpose to kill was formed and immediately executed in a passion, especially if the passion was aroused by a recent provocation or by mutual combat, the murder is not deliberate and premeditated. However, passion does not always reduce the crime since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design

to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect.' " *State v. Faust*, 254 N.C. 101, 108, 118 S.E. 2d 769, 773, *cert. denied*, 368 U.S. 851 (1961), *quoting* 40 C.J.S., Homicide, s. 33(d), pp. 889, 890. Thus a killing committed during the course of a quarrel or scuffle may yet constitute first degree murder provided the defendant formed the intent to kill in a cool state of blood before the quarrel or scuffle began and the killing during the quarrel was the product of this earlier formed intent. *See State v. French*, 225 N.C. 276, 34 S.E. 2d 157 (1945). If, however, the killing was the product of a specific intent to kill formed under the influence of the provocation of the quarrel or struggle itself, then there would be no deliberation and hence no murder in the first degree. *Id.*

The critical question for the jury in this case was whether "defendant did indeed deliberate, as distinguished from premeditate, the killing or did he form the intent to kill during a sudden passion provoked by the deceased [himself] which precluded any such deliberation." *State v. Patterson*, 288 N.C. 553, 575, 220 S.E. 2d 600, 616 (1975) (Exum, J., dissenting), *death sentence vacated*, 428 U.S. 904 (1976). Factors the jury may consider in determining the existence of premeditation and deliberation include: "[C]onduct and statements of the defendant both before and after the killing, *State v. Johnson*, 294 N.C. 288, 239 S.E. 2d 829 (1978), and . . . [T]hreats made against the deceased by the defendant, *State v. Stewart*, 292 N.C. 219, 232 S.E. 2d 443 (1977)." *State v. Potter*, 295 N.C. 126, 130-31, 244 S.E. 2d 397, 401 (1978).

[2]  In the case at bar all the evidence showed that the killing occurred after defendant and his father had engaged in a struggle and his father had twice "grabbed" defendant. There was also, however, plenary evidence from which the jury could reasonably infer that defendant had formed in a cool state of blood, the specific intent to kill his father well before the struggle actually occurred, and that the killing itself was the product of this earlier formed specific intent to kill rather than an intent formed under the influence of the provocation of the struggle itself.

This evidence in the light most favorable to the state was: Defendant had repeatedly told his siblings that his father was trying to poison him. He had threatened to kill his father on at least one previous occasion. As recently as one month before the killing

he told his sister "he'd never have peace" as long as his father was alive. On the day of the killing defendant entered a shed on his father's property, loaded a rifle, and tucked it under his belt where it was hidden by his jacket. He then entered his father's home, but did not confront his father until his sister had gone to work. His father was unarmed and aware of previous threats made by defendant against him. The only struggle resulted from the deceased's efforts to disarm defendant. After the shooting defendant acted dispassionately. He drove to his brother's home, but when he discovered his brother was not at home he decided to drive to South Carolina to help his sister move. When questioned by police officers in Dillon, South Carolina, later that day, defendant coherently and calmly related his actions of that day. He also told them that he carried a gun into his father's home because his father had attempted to poison him previously and because his father was involved in communist activity in the area.

There was, therefore, no error in denying defendant's motion to dismiss the charge of first degree murder for insufficiency of the evidence.

## II

[3] Defendant next assigns as error the refusal of the trial court to suppress his confession to police officers. Defendant argues he lacked sufficient mental capacity to competently and voluntarily confess at the time he was questioned by officers. He seeks to invoke the rule of *Blackburn v. Alabama*, 361 U.S. 199 (1960), and *State v. Ross*, 297 N.C. 137, 254 S.E. 2d 10 (1979), which held that an extra-judicial confession made while a defendant is mentally incompetent must be excluded at trial.

The indicia of incompetency found in *Blackburn v. Alabama*, *supra*, and *State v. Ross*, *supra*, are significantly different in kind and degree from those found in the present case. The defendant in *Blackburn* confessed shortly after a crime committed during an unauthorized absence from a Veterans Administration Hospital. He had been diagnosed as schizophrenic and classified as 100 percent incompetent. It was not until four years after his confession that he was declared competent to stand trial. His confession was obtained after eight or nine hours of interrogation in a tiny room with as many as three officers present. *Blackburn v. Alabama*, *supra*, 361 U.S. at 200-04.

In *Ross*, the incident and confession at issue occurred shortly after defendant had been involuntarily committed to John Umstead Hospital and subsequently released to his brother's care. Three days before the crime and confession defendant had been tentatively diagnosed as schizophrenic and given medication. His behavior surrounding the incident for which he was charged was bizarre and three days after his confession defendant was diagnosed as suffering from "chronic, undifferentiated schizophrenia." *State v. Ross, supra,* 297 N.C. at 138-42, 254 S.E. 2d at 12-13.

Defendant in this case, however, had presented significantly less compelling indicia of his incompetency. Although he had experienced psychiatric problems in the past and apparently entertained delusions about his father, he was able to function independently of supervision by medical personnel and family members in the weeks prior to the killing and the confession. He was found competent to stand trial after a psychiatric evaluation conducted shortly after his arrest. The trial court made factual findings following a *voir dire* hearing, concluding that defendant was informed of his *Miranda* rights and appeared to understand them. The court further found that defendant appeared to be coherent at the time of questioning and not under the influence of drugs other than prescribed medication. The questioning itself was conducted in a well-lighted conference room in less than two hours. Defendant's various statements during the questioning and afterwards were consistent. Thus, there was ample evidence to support the trial court's conclusion that defendant's statements to officers "were made freely and voluntarily and understandingly."

III

[4] Defendant's next assignment of error relates to the refusal of the trial court to allow cross-examination of defendant's siblings concerning their motives for hiring a private prosecutor. Several of defendant's brothers and sisters, including four who testified for the state at trial, hired a private prosecutor to represent the family. He aided in preparation and sat with the state's prosecutor at trial, but did not examine or cross-examine witnesses. Defense counsel was allowed to ask each of the testifying brothers and sisters whether they were among the family members who had employed private counsel, but was not allowed to pursue the questioning further.

Thus this case is distinguishable from prior cases in which this Court held it to be error to prevent any questioning at all on whether the witness had hired a private prosecutor. *See, e.g., State v. White,* 286 N.C. 395, 405-06, 211 S.E. 2d 445, 451 (1975). In the instant case the testifying family members admitted that the family was represented by a private prosecutor, thus the jury could infer the witnesses' biases from this information. Although the trial court characterized such employment as not unusual to one juror who questioned the arrangement, this comment did not remove the fact as indicative of interest in the case from the jury's consideration.

Defendant argues that the sibling witnesses had a pecuniary motive for hiring the private prosecutor and this should have been put before the jury. He contends they hoped to inherit a greater portion of their father's estate if defendant were to be disqualified as an heir because of a conviction for his father's murder, *see* G.S. 31A-3 *et seq.,* and that he should have been allowed to cross-examine them about this possible source of bias. Defendant's difficulty is that he made no record of what the witnesses would have testified to in this regard, so we have no basis for determining whether defendant was prejudiced by the trial court's refusal to allow further cross-examination on the issue. The failure to record the witnesses' excluded response precludes appellate review of its admissibility. *See, e.g., State v. Curry,* 288 N.C. 660, 220 S.E. 2d 545 (1975).

We note further that defendant could have read the statutes relating to this issue to the jury and argued the bias which these statutes might have engendered in the sibling witnesses. G.S. 84-14; *State v. Jones,* 296 N.C. 495, 251 S.E. 2d 425 (1979); *State v. McMorris,* 290 N.C. 286, 225 S.E. 2d 553 (1976). The witnesses' admission of bias is not a prerequisite for this kind of argument. Thus, we overrule this assignment of error.

IV

[5]   Defendant further assigns as error the admission of his brothers' testimony about statements made by defendant to them. Defendant's brothers were among the family members who employed a private prosecutor to represent the family in defendant's prosecution. Defendant argues that his brothers were tantamount to officers of the state because they had employed a

private prosecutor; thus statements to them were discoverable under G.S. 15A-903(a)(2).[2] He further argues that the state failed to supply these statements pursuant to defendant's request for discovery and this failure renders their admission prejudicial error.

There are several reasons why these contentions are without merit. This Court held in *State v. Crews*, 296 N.C. 607, 619-20, 252 S.E. 2d 745, 753-54 (1979), that only statements made by defendant to agents of the government are discoverable. We doubt that the mere employment of a private prosecutor makes one an agent of the state for the purposes of G.S. 15A-903(a)(2), but that question need not be decided in this case because the prosecutor apparently complied with the discovery request. Both before and during the *voir dire* which preceded jury selection, the prosecutor put defendant's counsel on notice of statements defendant had made to his brothers. The prosecutor stated that he "was generally familiar with the fact that some family members had talked to the [d]efendant," but it was not until the night before the hearing that he knew the details of those statements. Thus, the state apparently satisfied its continuing duty to disclose under G.S. 15A-907.[3] Defendant had an opportunity to call the brothers for questioning at the *voir dire*, but failed to do so.

Assuming arguendo that the state did fail to meet its obligation to disclose, defendant made no motions for relief under G.S.

---

2. This section states in pertinent part:

"*Disclosure of evidence by the State—information subject to disclosure.* — (a) Statement of Defendant. — Upon motion of a defendant, the court must order the prosecutor:

.  .  .  .

    (2) To divulge, in written or recorded form, the substance of any oral statement made by the defendant which the State intends to offer in evidence at the trial."

3. General Statute 15A-907 states:

"*Continuing duty to disclose.* — If a party, subject to compliance with an order issued pursuant to this Article, discovers prior to or during trial additional evidence or decides to use additional evidence, and the evidence is or may be subject to discovery or inspection under this Article, he must promptly notify the attorney for the other party of the existence of the additional evidence."

15A-910,[4] nor did he even object to the testimony of one brother at trial. Finally, the decision whether to admit evidence which was not disclosed during discovery is discretionary with the trial court. *State v. Braxton,* 294 N.C. 446, 472, 242 S.E. 2d 769, 784-85 (1978); *State v. Thomas,* 291 N.C. 687, 231 S.E. 2d 585 (1977). Absent abuse of discretion, and none is present here, the trial court's decision is not subject to appellate review. *See, e.g.,* 1 N.C. Index 3d, Appeal and Error § 54, p. 330 (1977).

V

**[6]** Defendant next asserts that the trial court committed reversible error when he defined involuntary manslaughter as "the unlawful killing of a human being by an unlawful act not amounting to a felony, or an act done in a criminally negligent way." Defendant contends the court should have said "unintentional killing" rather than "unlawful killing." We agree that the accepted definition of involuntary manslaughter is the unintentional killing of a human being by an unlawful act not amounting to a felony nor naturally dangerous to human life, or an act or omission which is criminally negligent. *State v. Redfern,* 291 N.C. 319, 230 S.E. 2d 152 (1976); N.C. P.I.—Crim. 206.11. Although involuntary manslaughter is an unlawful killing, like all homicides, the unintentional nature of the killing is that characteristic which in the ordinary case best distinguishes it from the other homicides.[5] We are satisfied, however, that this deviation from the accepted definition by the trial judge was not prejudicial in this case. First, the trial court explained the elements of involuntary manslaughter in two portions of his jury charge. It was only in the first that he used the term "unlawful killing." In the second he used the accepted definition. Then in his final mandate he appropriately ap-

---

4. Possible remedial measures the trial court could take under G.S. 15A-910 in addition to its contempt powers include:

"(1) Order the party to permit the discovery or inspection, or

(2) Grant a continuance or recess, or

(3) Prohibit the party from introducing evidence not disclosed, or

(4) Enter other appropriate orders."

5. We recognize that under some circumstances second degree murder may also involve an unintentional killing. *State v. Wilkerson,* 295 N.C. 559, 247 S.E. 2d 905 (1978).

plied the correct legal standard in charging on this crime. Because the use of the term "unlawful killing" was not altogether incorrect and because of these later correct instructions on the point we conclude no prejudice to defendant resulted. *See State v. Wells*, 290 N.C. 485, 226 S.E. 2d 325 (1976); *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1 (1966), *cert. denied*, 386 U.S. 911 (1967). Second, the record reveals no basis for submitting the alternative charge of involuntary manslaughter to the jury. There is no evidence that the shooting in this case was unintentional. *See State v. Faust, supra*, 254 N.C. at 112-13, 118 S.E. 2d at 776-77; *State v. Cope*, 204 N.C. 28, 31, 167 S.E. 456, 458 (1933). Because, however, defendant was convicted of first degree murder, he was not prejudiced by the erroneous submission of involuntary manslaughter. *Compare State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978), *with State v. Ray*, 299 N.C. 151, 261 S.E. 2d 789 (1980) (prejudicial error to submit lesser offense of involuntary manslaughter when no evidence to support charge and reasonable possibility of acquittal without it).

## VI

[7] The final issue raised by defendant is whether he was afforded effective assistance of counsel at trial. Defendant points to the failure of trial counsel to renew his motion to dismiss at the close of all the evidence and to introduce evidence in defendant's behalf. Neither of these omissions by trial counsel on this record constitute ineffective representation.

Defendant's right to assistance of counsel in a non-capital felony prosecution is guaranteed by the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, *Gideon v. Wainwright*, 372 U.S. 335 (1963), and Article I, Sections 19 and 23 of the North Carolina Constitution. The test of effective assistance of counsel has never been definitively stated by the United States Supreme Court; however, that Court has evaluated advice given a defendant who pleaded guilty by determining whether it was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Several courts, including this one, have looked "to the ABA Standards Relating to the Defense Function as a 'reliable guide for determining the responsibilities of defense counsel.' *Marzullo v. Maryland*, 561 F. 2d 540,

547 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 56 L.Ed. 2d 394, 98 S.Ct. 1885 (1978)." *State v. Milano,* 297 N.C. 485, 495, 256 S.E. 2d 154, 159 (1979).

The test of effective assistance has been expressed two ways by this Court. Traditionally, the formulation has been whether "the attorney's representation is so lacking that the trial has become a farce and a mockery of justice." *State v. Sneed,* 284 N.C. 606, 612, 201 S.E. 2d 867, 871 (1974). Recently, however, we employed the *McMann* standard and the ABA Standards without mention of the "farce and mockery" standard[6] in reviewing an ineffective assistance of counsel claim in a case in which the defendant had not pleaded guilty. *State v. Milano, supra,* 297 N.C. at 494, 256 S.E. 2d at 159. Under either of these tests defendant has failed to meet the "stringent standard of proof on the question of whether an accused has been denied Constitutionally effective representation." *State v. Sneed, supra,* 284 N.C. at 613, 201 S.E. 2d at 871-72.

The failure to renew a motion to dismiss made at the close of all the evidence does not preclude appellate review of the sufficiency of all the evidence in a criminal case. G.S. 15A-1227(d). Furthermore, defendant presented no evidence so a renewal of the motion would have been futile. The failure of defense counsel to renew his motion to dismiss does not constitute ineffective assistance of counsel.

[8] Defendant next attacks the decision not to put forth any evidence in his defense at trial. The decision not to testify at trial was clearly defendant's own. He made a sworn statement at trial, in response to the court's questioning, that he understood he had the right to testify but preferred not to do so.

Defendant also asserts it was ineffective representation for his counsel to fail to offer any psychiatric testimony about his mental condition. On the basis of this record we cannot say that the failure to introduce psychiatric testimony was "so flagrant

---

6. For a thorough overview of various judicial articulations of standards of competency required of criminal defense attorneys, a good criticism of the "farce and mockery" standard, and an argument for a more specific standard than within the range of competence demanded of attorneys in a criminal case" *see* Erickson, *Standards of Competency for Defense Counsel in a Criminal Case,* 17 Am. Crim. L. Rev. 233 (1979).

that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation." *Marzullo v. Maryland, supra,* 561 F. 2d at 544. Defense counsel requested and received a psychiatric determination of defendant's competency to stand trial. The record shows the court ordered as part of that report an evaluation of defendant's mental state on 10 June 1980. Absent some showing that evidence of defendant's insanity was available, or by the exercise of due diligence could have been developed by counsel and presented in defendant's behalf, we cannot conclude that defendant suffered from ineffective assistance of counsel because no such evidence was offered.[7]

Defendant having failed to show prejudicial error, we find in the verdict and judgment of the trial court

No error.

---

7. Our decision is, as it must be, based on the record before us. It is, of course, without prejudice to defendant's pursuit of this claim in appropriate post-conviction proceedings, if indeed he has more evidentiary support for his ineffective assistance claim than appears in this record.