PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THOMAS MICHAEL LARRY,

       *Petitioner-Appellant,*

       v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,

       *Respondent-Appellee.*

       No. 07-7

NORTH CAROLINA ACADEMY OF
TRIAL LAWYERS,

       *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, Senior District Judge.
(1:05-cv-00628-WLO)

Argued: October 30, 2008

Decided: January 5, 2009

Before TRAXLER and SHEDD, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Shedd wrote the opinion, in which Judge Traxler and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Elizabeth Ann Hambourger, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Diane Appleton Reeves, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Gretchen M. Engel, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Roy Cooper, North Carolina Attorney General, Raleigh, North Carolina, for Appellee. Burton Craige, PATTERSON HARKAVY, L.L.P., Raleigh, North Carolina, for Amicus Supporting Appellant.

---

## OPINION

SHEDD, Circuit Judge:

Thomas Michael Larry was sentenced to death after a North Carolina jury found him guilty of first-degree murder and robbery with a firearm. Larry unsuccessfully challenged his conviction and sentence in state court, both on direct appeal and in collateral proceedings, and then filed a petition for writ of habeas corpus in federal district court. The district court denied Larry's petition. We granted Larry a certificate of appealability to consider two issues: (1) whether the state court erred by rejecting his request for a second-degree murder jury instruction and (2) whether he is ineligible for capital punishment because of mental retardation. For the following reasons, we affirm the district court's judgment.

I.

A.

We begin with a summary of the facts pertaining to Larry's

underlying crimes, as articulated by the North Carolina Supreme Court:[1]

"The evidence at trial tended to show that on 15 January 1994, at approximately 9:30 p.m., Larry robbed a Food Lion grocery store in Winston-Salem. Cynthia Pennell, a Food Lion employee who had access to the safe, saw Larry standing in the front part of the store and asked if she could help him. He said that she could open the safe for him and that if she did not, she was a dead woman. He pointed a small black revolver at her. Pennell went to the safe and opened it. Larry took at least $1,700 from the safe and put it in a box. He put the box under his arm and went outside. Throughout the robbery, he pointed the gun at others in the store, telling them not to move.

"The murder victim, Robert Buitrago, an off-duty police officer, was a customer waiting in line at a register when the robbery occurred. One witness, Chastity Adams, saw Larry point the gun at Buitrago and say, 'If you move, you're dead.' The cashier for Buitrago's line had her back to Larry but heard him say, 'Don't move or I'll kill you.' Larry ran from the store, and Buitrago chased him. When Buitrago caught up with Larry outside the store, near the front doors, a struggle ensued, and Larry fatally shot Buitrago with the handgun. Some witnesses said there was one shot, and some said there were two or more shots. Buitrago died from a single gunshot wound to the chest. Larry fled on foot.

"After witnesses identified Larry as the perpetrator, police obtained arrest warrants and subsequently found Larry hiding in a residence in Winston-Salem." *State v. Larry*, 481 S.E.2d 907, 913 (N.C. 1997).[2]

---

[1]For purposes of clarity, we have altered the quotations from the North Carolina Supreme Court's decision by changing "defendant" to "Larry."

[2]According to a number of witnesses who testified at Larry's trial, Buitrago ran after Larry when he fled the store and struck Larry in the head with a wine bottle, and then the struggle ensued. J.A. 121, 142.

After the close of evidence, the trial judge excused the jury and conducted a charge conference. During this conference, Larry asked the judge to instruct the jury on second-degree murder. In response, the prosecutor stated:

> I think out of an abundance of precaution, the Court should probably instruct on second degree. I say that for this reason: There was testimony from one individual . . . that the defendant appeared surprised . . . [w]hen he was confronted by Officer Buitrago. And based on that, the jury could find that he didn't actually premeditate the murder or deliberate upon the murder, just fired instinctively.

J.A. 185.

Ultimately, the trial judge denied Larry's request for a second-degree murder instruction and instead instructed the jury on first-degree murder and robbery with a firearm. With respect to first-degree murder, the judge instructed the jury that it could find Larry guilty under either one of two theories (or both): (1) malice, premeditation, and deliberation; or (2) felony murder. After deliberating, the jury found Larry guilty of first-degree murder under both theories, and it also found him guilty of robbery with a firearm. *Larry*, 481 S.E.2d at 913.

The North Carolina Supreme Court summarized the facts regarding the sentencing phase of Larry's trial as follows:

"At the sentencing proceeding, the State presented evidence that Larry previously had been convicted once for common law robbery and three times for armed robbery. The jury found as four separate aggravating circumstances that Larry previously had been convicted of a violent felony. The jury also found as an aggravating circumstance that the murder was committed while Larry was engaged in the commission of a robbery. The jury found the statutory mitigating circum-

stances that the murder was committed while Larry was mentally or emotionally disturbed and that Larry's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. The jury also found five nonstatutory mitigating circumstances as well as the catchall mitigating circumstance. However, the jury recommended a sentence of death. The court sentenced Larry to death for the first-degree murder conviction and to a consecutive term of forty years' imprisonment for the armed robbery conviction." *Larry*, 481 S.E.2d at 913-14.

Larry appealed his conviction and sentence to the North Carolina Supreme Court arguing, *inter alia*, that the trial court erred by not instructing the jury on second-degree murder. However, the state supreme court held that the trial court did not err because the evidence did not support a second-degree murder instruction since "there was positive, uncontradicted evidence of each element of first-degree murder." *Larry*, 481 S.E.2d at 919. The state supreme court thus affirmed Larry's conviction and sentence, *id.* at 929, and the United States Supreme Court denied his petition for certiorari, *Larry v. North Carolina*, 522 U.S. 917 (1997).

## B.

Thereafter, Larry filed a number of collateral, post-conviction challenges in state court. He filed his first Motion for Appropriate Relief ("MAR") in state superior court in 1998 (the "First MAR"). The superior court denied Larry's First MAR, and the North Carolina Supreme Court denied his petition for certiorari. *State v. Larry*, 566 S.E.2d 84 (N.C. 2002).

After Larry filed his First MAR, the North Carolina General Assembly passed a law prohibiting the execution of mentally retarded individuals. *See* N.C. Gen. Stat. § 15A-2005.[3]

---

[3]North Carolina passed this law almost a year before the United States Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded individuals. *See Atkins v. Virginia*, 536 U.S. 304 (2002); *see also* discussion *infra* Part II.B.

The statute defines mental retardation as "[s]ignificantly sub-average general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18." *Id.* § 15A-2005(a)(1). The statute defines "[s]ignificantly subaverage general intellectual functioning" as "[a]n intelligence quotient of 70 or below." *Id.* The statute also provides that "[a]n intelligence quotient of 70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning." *Id.* § 15A-2005(a)(2). The statute defines "[s]ignificant limitations in adaptive functioning" as "[s]ignificant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills and work skills." *Id.* § 15A-2005(a)(1).

In cases, as here, where a capital defendant had been sentenced to death prior to the statute's effective date, another state statute authorized defendants to file an MAR to seek relief from their capital sentence on the basis of mental retardation. *See* N.C. Gen. Stat. § 15A-2006 (repealed Oct. 1, 2002). In these cases, the capital defendant bears the burden of proof and must establish mental retardation by a preponderance of the evidence. *See id.*; *see also id.* § 15A-1420.

In light of North Carolina's new statute, Larry filed a second MAR (the "Second MAR") in state superior court on January 30, 2002 (the "Second MAR Court"). In his Second MAR, Larry claimed that he was mentally retarded within the meaning of state law and, therefore, ineligible for capital punishment. The Second MAR Court held an evidentiary hearing in June 2003, *see* J.A. 408-693, to consider Larry's mental retardation claim.

At the hearing, the Second MAR Court heard from a number of witnesses. Larry's expert, clinical forensic psychologist

Dr. Brad Fisher, testified that Larry received a full scale score of 69 on the WAIS-R intelligence test and that Larry put forth his best effort on the test. However, Dr. Fisher admitted that he did not test Larry for malingering. Dr. Fisher also testified that Larry suffered significant limitations in more than two adaptive skill areas.

In contrast, the State's expert, clinical psychologist and forensic psychologist Dr. Mark Hazelrigg, testified that Larry received a full scale score of 74 on the WAIS-III intelligence test. Dr. Hazelrigg also stated that the WAIS-R test was out-dated. Moreover, Dr. Hazelrigg stated that he administered a specific test to check for malingering, and he concluded that Larry put forth an adequate amount of effort on the WAIS-III, but probably not his best effort. Additionally, based on Larry's performance on the Street Skills Survival Question-naire (the "SSSQ") and other evidence, Dr. Hazelrigg con-cluded that Larry was impaired in only two adaptive skill areas, namely, he suffered mild impairment in the areas of health and safety, and functional academics.[4] Dr. Hazelrigg concluded that Larry was not mentally retarded within the meaning of North Carolina law.

With respect to the first prong of North Carolina's mental retardation law, the Second MAR Court concluded that Larry failed to prove by a preponderance of the evidence that he had an I.Q. of 70 or below.[5] In reaching this conclusion, the Sec-

---

[4]Dr. Hazelrigg indicated that he could not assess Larry's work skills. J.A. 570.

[5]In addition to the 69 and 74 Larry scored on the tests administered by Dr. Fisher and Dr. Hazelrigg, the Second MAR Court found that Larry scored an 84, 88, and 87 on three beta screening tests administered by the Department of Corrections. J.A. 686. Dr. Hazelrigg stated that beta tests are briefer and not as comprehensive as larger, multifaceted tests such as the WAIS. J.A. 582-83. In addition, he stated that they are sometimes administered in a group setting, rather than in an individualized setting. *Id.* Consequently, Dr. Hazelrigg testified that he does not give great weight to them. *Id.*

ond MAR Court noted that Dr. Hazelrigg tested Larry for malingering when he administered the WAIS-III exam. The Second MAR Court also noted that Dr. Hazelrigg stated that the WAIS-R test was outdated. Turning to the second prong of North Carolina's mental retardation law, the Second MAR Court concluded that Larry failed to establish by a preponderance of the evidence that he suffered significant limitations in at least two adaptive skill areas.[6] In light of these two findings, the Second MAR Court denied Larry's Second MAR, and the North Carolina Supreme Court denied his petition for certiorari. *State v. Larry*, 611 S.E.2d 842 (N.C. 2005).

### C.

In July 2005, Larry filed a petition for writ of habeas corpus in federal district court. *See* 28 U.S.C. § 2254. Along with his petition, Larry filed a motion asking the district court to hold the federal habeas proceedings in abeyance pending the outcome of his third state MAR.[7] The district court denied Larry's motion and referred the case to a magistrate judge.

Larry then moved to expand the record to include two new pieces of evidence: (1) his June 2005 full scale score of 69 on the Stanford-Binet, Fifth Edition ("SB5") intelligence test; and (2) a North Carolina superior court decision, which, according to Larry, found the SSSQ to be an unreliable measure of adaptive skills. The magistrate judge denied Larry's motion to expand the record and recommended that his peti-

---

[6]However, the Second MAR Court did conclude that Larry suffered significant limitations in one statutory skill area: functional academics.

[7]Larry filed a third MAR, a Motion to Reopen Litigation of the Defendant's Mental Retardation Claim, and a Motion for an Evidentiary Hearing in state superior court (collectively, the "Third MAR") on the same day he filed his federal habeas corpus petition. The state superior court denied Larry's Third MAR in an order filed on March 8, 2007, J.A. 694-728, and the North Carolina Supreme Court denied his petition for certiorari, *see* *State v. Larry*, 654 S.E.2d 703 (N.C. 2007).

tion be denied.[8] Larry filed objections to the magistrate judge's recommendation. After reviewing Larry's objections *de novo*, the district court denied his petition and dismissed the action. The district court also denied Larry's application for a certificate of appealability.

## II.

We granted Larry's motion for a certificate of appealability to consider, *inter alia*, claims he raises under *Beck v. Alabama*, 447 U.S. 625 (1980), and *Atkins v. Virginia*, 536 U.S. 304 (2002).

## A.

In *Beck*, the Supreme Court held that capital defendants have a constitutional right to a lesser-degree offense instruction "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense." *Beck*, 447 U.S. at 637. At the same time, however, "[a] defendant is not entitled to have the jury instructed as to lesser degrees of the crime simply because the crime charged is murder." *Bates v. Lee*, 308 F.3d 411, 418 (4th Cir. 2002) (quotation marks omitted). Rather, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction," and "[t]he federal rule is that a lesser included offense instruction should be given if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Hopper v. Evans*, 456 U.S. 605, 611-612 (1982) (quotation marks omitted).

---

[8]On appeal, Larry argues that the federal district court abused its discretion by denying his motion to expand the record. We find no error in the district court's decision to deny Larry's motion.

## B.

In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded criminals. 536 U.S. at 321. The Court concluded that a national legislative consensus against the execution of mentally retarded offenders had developed, and it identified two reasons consistent with that consensus to justify a categorical exclusion of the mentally retarded from execution: (1) the justifications for recognizing the death penalty (*i.e.*, retribution and deterrence) do not apply to mentally retarded offenders; and (2) the diminished capacity of mentally retarded offenders places them at greater risk of wrongful execution. *Id.* at 316-21. The Court noted that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317. Continuing, the Court observed that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus"; however, instead of defining that range, the Court expressly left to the states the "'task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17 (1986)).

## III.

## A.

We review the district court's denial of Larry's petition *de novo*. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). However, under 28 U.S.C. § 2254, "the scope of our review is highly constrained." *Jackson v. Johnson*, 523 F.3d 273, 276 (4th Cir. 2008). We may only grant Larry relief if the state court's adjudication of his claims (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.

§ 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Tucker*, 350 F.3d at 438. A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) when it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court, or "confronts a set of facts that are materially indistinguishable from a decision of . . . [the Supreme] Court and nevertheless arrives at a result different from . . . [that] precedent," *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state court's decision involves an "unreasonable application" of clearly established federal law under § 2254(d)(1) "if the state court identifies the correct governing legal rule from . . . [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. This standard is quite deferential: "The state court's application of clearly established federal law must be 'objectively unreasonable,' and 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Robinson v. Polk*, 438 F.3d 350, 355 (4th Cir. 2006) (quoting *Williams*, 529 U.S. at 411). Moreover, when "assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether [its decision] [was] well reasoned." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (quotation marks omitted).

Similarly, a petitioner alleging that a state court based its decision on an "unreasonable determination of the facts" under § 2254(d)(2) must satisfy a demanding standard: "The

question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939 (2007). Moreover, § 2254(e)(1) provides that a state court's factual decisions "shall be presumed to be correct" and that the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C § 2254(e)(1).[9]

### B.

With these principles in mind, we turn to Larry's lesser-degree claims.[10] Larry contends that the North Carolina Supreme Court's adjudication of his lesser-degree claim resulted in a decision that was contrary to, or involved an unreasonable application of, *Beck* and its progeny within the meaning of § 2254(d)(1). He argues that the court erred because it did not expressly inquire whether the evidence warranted a second-degree murder instruction but, instead, viewed the evidence in the light most favorable to the prosecution and only inquired whether the evidence supported a

---

[9]Moreover, in cases proceeding under either § 2254(d)(1) or § 2254(d)(2), we can only grant the petitioner relief if the error had "a substantial and injurious effect or influence on determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation marks omitted).

[10]Even though Larry's lesser-degree claims ask us to review the North Carolina Supreme Court's 1997 adjudication of his direct appeal — rather than a decision on collateral review — we conclude that Larry has exhausted his state remedies for purposes of § 2254 because he gave the North Carolina Supreme Court a "full and fair opportunity" to consider the substance of his lesser-degree claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Skipper v. French*, 130 F.3d 603, 610 n.4 (4th Cir. 1997) (holding on federal habeas review of a North Carolina conviction that "[e]xhaustion principles would not have required" petitioner even to bring a MAR at all, so long as he raised federal claims on direct appeal).

first-degree murder instruction. We disagree with Larry's characterization of the state court's decision.

At the outset of its analysis, the North Carolina Supreme Court correctly identified *Beck* and *Hopper* as the law governing Larry's claim, noting that a "lesser included offense instruction must be given if the evidence "would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater."" *Larry*, 481 S.E.2d at 918 (quoting *State v. Strickland*, 298 S.E.2d 645, 654 (N.C. 1983) (quoting *Beck*, 447 U.S. at 635)); *see also Larry*, 481 S.E.2d at 919 (citing *Hopper*). Continuing, the court noted that under state law "'[t]he test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict [the] defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and *whether there is any conflicting evidence relating to any of these elements*.'" *Larry*, 481 S.E.2d at 918 (emphasis added) (quoting *State v. Skipper*, 446 S.E.2d 252, 265 (N.C. 1994)). In other words, "'[i]f the State's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration.'" *Bates*, 308 F.3d at 419 (quoting *State v. Flowers*, 489 S.E.2d 391, 407 (N.C. 1997)). Applying this test in Larry's case, the court reviewed the evidence and concluded that it did not support a second-degree murder instruction "because there was positive, *uncontradicted evidence* of each element of first-degree murder." *Larry*, 481 S.E.2d at 919 (emphasis added). Larry's argument fails to appreciate the significance of this holding.

Under North Carolina law, first-degree murder is the "unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Bonney*, 405 S.E.2d 145, 154 (N.C. 1991). Second-degree murder is the "unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Thibodeaux*, 532 S.E.2d 797,

806 (N.C. 2000) (quotation marks omitted). Consequently, when the North Carolina Supreme Court inquired whether there was uncontradicted evidence of each *element* of first-degree murder, *see Larry*, 481 S.E.2d at 919, it necessarily considered whether the evidence of premeditation and deliberation was uncontroverted (*i.e.*, it considered whether the evidence would support a finding that Larry acted without premeditation or deliberation).

Though Larry argues that it was unreasonable for the state court to conclude that the evidence of premeditation and deliberation was uncontradicted, Larry does not dispute that he carried a loaded gun into the store, pointed the gun at Buitrago, threatened to shoot him if he moved, and then a short time later shot him in the chest as the two men struggled just outside the store. Petitioner's Br. at 5-6; Reply Br. at 9. Rather, the gravamen of his claim is that certain facts contradict the conclusion that he acted with premeditation and deliberation *at the exact moment* he pulled the trigger. He points to the following facts in support of his argument: (1) he did not harm anyone in the store, even though he brandished a gun and made several threats to shoot anyone who tried to stop him; (2) the shooting occurred during a struggle, while Larry was fleeing the scene; (3) one witness testified that Larry looked surprised by Buitrago's actions; (4) only a matter of seconds passed between the time Buitrago struck Larry with the wine bottle and the shooting; (5) he only fired one shot; (6) after firing, he made no effort to ensure that Buitrago was dead; (7) he did not know Buitrago was a police officer; and (8) one of the State's prosecutors stated that a jury could find that Larry did not premeditate or deliberate. In other words, because he did not pull the trigger inside the store at the same time he verbally threatened to shoot Buitrago, and instead shot Buitrago moments later during a struggle outside the store, Larry contends the North Carolina Supreme Court could not reasonably have determined that the evidence of premeditation and deliberation was uncontradicted. We do not agree with this argument.

Under North Carolina law, premeditation means the "defendant formed the specific intent to kill the victim for some period of time, however short, before the actual killing." *State v. Misenheimer*, 282 S.E.2d 791, 795 (N.C. 1981). "Deliberation means that the intent to kill was formed while defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation." *Id.* Significantly, however, "cool state of blood" does not mean "an absence of passion and emotion." *Id.* (quotation marks omitted). Rather, under state law, a defendant "may deliberate, may premeditate . . . although prompted and to a large extent controlled by passion at the time." *Id.* (quotation marks omitted). Indeed, "[i]f the design to kill was formed with deliberation and premeditation, it is *immaterial* that defendant was in a passion or excited when the design was carried into effect." *Id.* (emphasis added) (quotation marks omitted). "Thus a killing committed during the course of a quarrel or scuffle may yet constitute first degree murder provided the defendant formed the intent to kill in a cool state of blood before the quarrel or scuffle began and the killing during the quarrel was the product of this earlier formed intent." *Id.* Additionally, it is sufficient that the processes of premeditation and deliberation occur prior to, and not simultaneously with, the killing. *State v. Holder*, 418 S.E.2d 197, 204 (N.C. 1992).

In light of North Carolina law, and the undisputed fact that Larry verbally threatened to shoot Buitrago while they were inside the store, it was not unreasonable for the state court to conclude that it was uncontradicted that Larry formed an intent to kill with premeditation and deliberation. Nor was it unreasonable for the state court to conclude that after Larry formed that intention nothing happened in the succeeding moments sufficient to alter his mental state or contradict a finding that he shot Buitrago with premeditation and deliberation.

Contrary to Larry's contention, then, the state court did consider whether the evidence would support a second-degree murder instruction. In turn, since United States Supreme Court precedent only requires that a state court give a lesser-degree instruction "when the evidence warrants such an instruction," *see Hopper*, 456 U.S. at 611, we conclude that the North Carolina Supreme Court's adjudication of Larry's lesser-degree claim was neither contrary to, nor an unreasonable application of, federal law within the meaning of § 2254(d)(1).[11]

## C.

We now turn to Larry's mental retardation claims. As noted above, Larry contends that he is mentally retarded and therefore ineligible for capital punishment. In pursuing this argument on appeal, Larry presents claims under both § 2254(d)(1) and 2254(d)(2). However, he is not entitled to relief on any of these claims.

### 1.

Larry presents three primary claims under § 2254(d)(1). First, he argues that the Second MAR Court erred by reading North Carolina's mental retardation statute, N.C. Gen. Stat. § 15A-2005, as requiring him to establish an I.Q. of 70 or below to prevail on his mental retardation claim. According to Larry, a person could be mentally retarded within the meaning of § 15A-2005 even if they have an I.Q. greater than

---

[11]Although Larry appears to argue that it was an unreasonable determination of fact under § 2254(d)(2) for the state court to conclude that the evidence of premeditation and deliberation was uncontradicted, *see* Petitioner's Br. at 27, 33, we believe this claim is more properly characterized as one raised under § 2254(d)(1). However, to the extent Larry's claim can be construed as one arising under § 2254(d)(2), we conclude that the North Carolina Supreme Court's adjudication of his lesser-degree claim was not based on an unreasonable determination of fact.

70 because the statute provides that a person's I.Q. is merely *evidence* of mental retardation *vel non*.

We express no opinion on the merits of this claim because it does not fall within the proper scope of our federal habeas review. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998) ("It is black letter law that a federal court may grant habeas relief only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." (quotation marks omitted)). Because this particular argument rests solely upon an interpretation of North Carolina statutory law, it is simply not cognizable on federal habeas review.

Second, Larry argues that requiring him to establish an I.Q. of 70 or below resulted in a decision that was contrary to, or involved an unreasonable application of, *Atkins* because persons with I.Q. scores above 70 may be mentally retarded. In support of this argument, Larry notes that some state mental retardation laws do not require defendants to establish any particular I.Q. score, while other states only require defendants to establish I.Q. scores of 75 or below. As noted above, however, *Atkins* expressly left to the states the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences. *Atkins*, 536 U.S. at 317. Moreover, the Supreme Court cited North Carolina's mental retardation statute approvingly in *Atkins* and identified it as a law prohibiting the execution of mentally retarded defendants. *See Atkins*, 536 U.S. at 315.[12] Consequently, we

---

[12]*Cf. Atkins*, 536 U.S. at 308 n.3 (noting that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70").

hold that requiring Larry to establish an I.Q. of 70 or less is neither contrary to, nor an unreasonable application of, *Atkins*.

Third, Larry contends that *Atkins* requires every state to employ a particular "clinical" approach to measuring a defendant's adaptive skills. He argues that the clinical approach mandated by *Atkins requires* states to measure a defendant's adaptive skills based on how the defendant actually or typically functions in the real world, rather than on the skills the defendant is capable of performing but chooses not to perform. Therefore, he argues, the Second MAR Court's adjudication of his mental retardation claim resulted in a decision that was contrary to, or involved an unreasonable application of, federal law because he believes the Second MAR Court focused on the skills he *could* perform, rather than those he actually did perform in a real world environment.[13]

The Supreme Court did discuss "clinical definitions" of mental retardation in *Atkins* and observed that "clinical definitions of mental retardation require not only subaverage intellectual functioning, *but also* significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 318 (emphasis added). Nonetheless, Larry's argument does not withstand scrutiny because *Atkins* does not require states to use a specific method of determining whether a defendant is mentally retarded; rather, as noted above, *Atkins* expressly left to the states the task of defining mental retardation. *Atkins*, 536 U.S. at 317; *see also Conaway v. Polk*, 453 F.3d 567, 591 (4th Cir. 2006). Accordingly, we hold that the Second MAR Court's adjudication of Larry's mental retardation claim did not result in a decision that was contrary to, or involved an

---

[13]To the extent Larry is arguing that the Second MAR Court did not properly apply the adaptive functioning prong of North Carolina's mental retardation statute, we cannot grant him any relief because doing so would require us to review a state court's application of state law — something that the habeas statute does not authorize. *Wright*, 151 F.3d at 157.

unreasonable application of, *Atkins* within the meaning of § 2254(d)(1).

2.

Larry also argues that the Second MAR Court's adjudication of his mental retardation claim was based on unreasonable determinations of fact within the meaning of § 2254(d)(2). He presents two distinct § 2254(d)(2) claims, but neither claim merits relief.

First, he argues that it was unreasonable for the Second MAR Court to conclude that he did not suffer from significant limitations in at least two adaptive skill areas. As discussed above, the Second MAR Court held an evidentiary hearing to consider Larry's mental retardation claim. At this hearing, the Second MAR Court heard from a number of witnesses who testified about Larry's adaptive skills, including the State's expert, Dr. Hazelrigg, and Larry's expert, Dr. Fisher. Dr. Hazelrigg testified that Larry suffered *mild* impairment in two adaptive skill areas (health and safety, and functional academics), but did not suffer *significant* limitations in at least two areas as required by North Carolina law. In contrast, Dr. Fisher testified that Larry suffered significant limitations in nearly every adaptive skill area, but, at a minimum, in more than two.

On appeal, Larry argues that it was unreasonable for the Second MAR Court to conclude that he did not suffer significant limitations in the areas of self-care and work. With regard to Larry's work skills, the Second MAR Court stated:

> [T]he defense has not established by a preponderance of the evidence that the defendant has a significant limitation in this area. Even though the witness contends that the defendant never held a job for more than three weeks and that each position has been menial, DOC records indicate to the contrary,

citing a job he held one time for three months at $338 a week.

Further, for the vast majority of what would have been the defendant's work life, he has been incarcerated. Further, that he has held several work positions in the prison setting and that he has held positions working both within the prison and working outside of the prison setting which the Court will note were later revoked not because of poor job performance but for failure to return on time and follow the rules.

J.A. 687-88. Regarding Larry's self-care, the Second MAR Court noted:

[T]he defense has not established by a preponderance of the evidence that the defendant has significant limitations in this area. Again, the SSSQ test revealed that the defendant understands basic concepts and signs. Further, the defendant is caring for himself within the parameters of his current environment.

The Court will further note that as a child the defendant was apparently allowed to run free on many days and even though he would have to be reminded to wash or change dirty clothes, as many children have to be reminded at that age, he was able to care for himself while on these frolics . . . .

J.A. 688.

We must presume that the Second MAR Court's factual findings were correct, and Larry bears the burden of rebutting this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Based on our review of the evidence presented to the Second MAR Court, we conclude that Larry has not carried his burden. Faced with the parties' dueling

experts, the Second MAR Court thoroughly discussed the evidence presented by both parties and concluded that Larry failed to establish by a preponderance of the evidence that he suffered significant limitations in at least two adaptive skill areas. In the end, the Second MAR Court apparently relied more heavily on Dr. Hazelrigg's conclusions than on Dr. Fisher's, but this does not make its determination of fact unreasonable. *See Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear." (citing 28 U.S.C. § 2254(e)(1))).

Second, Larry argues that it was unreasonable for the Second MAR Court not to conclude he had an I.Q. of 70 or below. In support of this argument, he contends that the Second MAR Court impermissibly relied on three beta I.Q. tests where Larry scored 84, 88, and 87. According to Larry, beta test scores cannot be considered because they do not satisfy either "clinical standards" or "statutory standards adopted in North Carolina." Petitioner's Br. at 45-46.[14]

As Larry points out, the Second MAR Court mentioned the scores he received on the beta I.Q. tests. However, the Second MAR Court also noted that Larry scored a 69 on the WAIS-R test administered by his expert and a 74 on a WAIS-III test administered by the State's expert. Based on these conflicting scores, the Second MAR Court concluded that Larry did not establish, by a preponderance of the evidence, that his I.Q. was 70 or below. Applying the standards mandated by § 2254, we conclude that this was not an unreasonable determination of the facts. *See Green v. Johnson*, 515 F.3d 290, 300-01 (4th Cir. 2008) (holding that it was not unreasonable for a state court to find that the defendant's I.Q. exceeded 70, when he

---

[14]To the extent Larry is arguing that North Carolina law prohibited the Second MAR Court from considering the three beta I.Q. scores, we note that this argument does not fall within the scope of our federal habeas review. *Wright*, 151 F.3d at 157.

scored above 70 on some tests, but below 70 on another test), *cert. denied*, 128 S.Ct. 2999 (2008).

## IV.

For the foregoing reasons, we affirm the district court's judgment denying Larry's petition for federal habeas corpus relief.

*AFFIRMED*