An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-706

NORTH CAROLINA COURT OF APPEALS

Filed: 18 Mar 2014

STATE OF NORTH CAROLINA

v.

Rowan County
No. 10 CRS 53951

LARRY WAYNE CALL


Appeal by defendant from judgment entered 9 November 2012 by Judge W. David Lee in Rowan County Superior Court. Heard in the Court of Appeals 7 November 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

> *Michael E. Casterline for Defendant.*

ERVIN, Judge.

Defendant Larry Wayne Call appeals from a judgment sentencing him to life imprisonment without the possibility of parole based upon his conviction for first degree murder in connection with the death of Kevin Michael Rufty. On appeal, Defendant contends that the trial court erred by failing to instruct the jury concerning the issue of his guilt of the lesser included offense of second degree murder on the grounds that he specifically requested that such an instruction be given and on the grounds that the record would have supported a

decision to convict him of second degree murder. After careful consideration of Defendant's challenge to the trial court's judgment in light of the record and the applicable law, we conclude that the trial court's judgment should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

#### 1. State's Evidence

Tamara Lee Propst and Defendant lived together and held themselves out as a married couple, in Faith, North Carolina, despite the fact that they were not married. By June 2010, the relationship between Ms. Propst and Defendant had become "rocky." Even though Ms. Propst was involved in a romantic relationship with Defendant, she worked as a prostitute to earn money to support her drug habit and was involved in a sexual relationship with Mr. Rufty as well. Mr. Rufty, who worked as a long distance truck driver, was not one of Ms. Propst's "customers." At some point in time, Ms. Propst introduced Defendant to Mr. Rufty.

On Saturday, 26 June 2010, Ms. Propst was socializing at the home of another friend named Tommy Ridenhour. While she was at Mr. Ridenhour's residence, Ms. Propst received numerous calls from Defendant, who asked her to come home so that the two could attempt to resolve their disagreements and so that he could

obtain possession of the Mazda automobile that the two of them shared. Instead of telling him where she was, Ms. Propst informed Defendant that she was out of town and did not have sufficient fuel to make it back home. Subsequently, Ms. Propst went to a motel with a number of other individuals, including Mr. Rufty and Anthony Witte, to consume drugs. After leaving the motel, Mr. Rufty drove Ms. Propst to a lake in order to find a secluded place at which they could engage in sexual intercourse.

After reaching the lake, Ms. Propst and Mr. Rufty drank alcohol, consumed drugs, and engaged in sexual intercourse. Although Mr. Rufty attempted to have anal intercourse with Ms. Propst during their encounter, she was not amenable to engaging in that sort of activity. As a result, Ms. Propst struck Mr. Rufty and began walking up the road while donning her clothes. After getting in his car, Mr. Rufty drove up beside Ms. Propst, apologized for his conduct, and asked her to get in the vehicle. In response to his entreaties, Ms. Propst eventually entered Mr. Rufty's vehicle and had him take her to the residence of David Brown, who was another one of her friends.

Ms. Propst eventually got a ride back to Mr. Ridenhour's home, at which she had left the Mazda. After her arrival, Ms. Propst told Mr. Ridenhour what Mr. Rufty had tried to do. At some point during the evening, Ms. Propst went to sleep. Upon

awakening the following morning, Ms. Propst found that the same individuals who had been at the motel on the previous day were at Mr. Ridenhour's residence.

In the course of that morning, Defendant called Ms. Propst and asked her for directions to Mr. Ridenhour's residence. However, Ms. Propst refused to provide Defendant with that information. Subsequently, someone began banging on the door. After Mr. Ridenhour answered the door, Defendant, who appeared to have overheard a conversation through an open window concerning what had happened to Ms. Propst, pushed himself inside while carrying a cooler and a knife. The fact that Defendant was armed was not unusual.

As he entered Mr. Ridenhour's residence, Defendant was yelling, demanding to be told the identity of the person who had assaulted Ms. Propst, and asserting that he would physically harm the person who had wronged her. Although Defendant asked for Mr. Rufty's telephone number, Ms. Propst claimed that she did not have the requested information in her possession. However, Mr. Witte provided Defendant with Mr. Rufty's number.[1] After Defendant made an unsuccessful attempt to reach Mr. Rufty by phone, Defendant and Ms. Propst left Mr. Ridenhour's residence and went home. Defendant made numerous statements

---

[1]Mr. Witte testified that he gave Mr. Rufty's telephone number to Ms. Propst, but did not provide this information to Defendant.

that he was going to hurt Mr. Rufty during the course of his sojourn at Mr. Ridenhour's residence.

After returning home, Defendant received a phone call. During the course of his discussion with the caller, Defendant gave someone directions about how to reach the house at which he and Ms. Propst lived. At the conclusion of this conversation, Defendant grabbed his cooler and some beer and told Ms. Propst that his ride had arrived and that he had to leave. As Defendant left, he told Ms. Propst that she might have to come pick him up at a later time. Upon looking out the window, Ms. Propst observed that Defendant, who was wearing a white shirt, white shoes, blue jean shorts, and a knife sheath, was leaving with Mr. Rufty. In light of the disparity between their respective sizes, Ms. Propst believed that Mr. Rufty would hurt Defendant if the two of them became involved in an altercation. Although Ms. Propst had agreed to pick Defendant up, she had no intention of actually carrying out that promise.

After Defendant's departure, Ms. Propst decided to go to the residence of one of her "customers." While she was en route, Defendant called Ms. Propst and obtained her agreement to pick him up in a few minutes. In the course of their conversation, Defendant also told Ms. Propst that he stabbed "the guy" several times, that he had blood all over himself, that he did not know what to do with the knife with which he had

stabbed the other individual, that the injured individual had driven off, and that he heard the injured individual become involved in an automobile accident. Defendant told Ms. Propst that he was on the Third Street bridge, which was close to Grubb Ferry Road, and stated that, if anyone questioned her about his whereabouts, Ms. Propst should say that he had been fishing all day.

In spite of her promise to Defendant, Ms. Propst continued driving to her "customer's" residence. As a result of the fact that Defendant kept calling her, Ms. Propst turned off her phone. Ms. Propst did not believe that Defendant had actually killed anyone given that she had never observed him act in an aggressive manner towards anyone except herself.

After Ms. Propst failed to honor her promise to come get him, Defendant called Jessie Brady, one of his co-workers, and asked her to come to the Third Street bridge and give him a ride. At the time that Ms. Brady picked Defendant up, he was shirtless and had a blood-smeared face. As they drove off, Defendant refused to look at a wreck that they passed on Grubb Ferry Road. Defendant did, however, tell Ms. Brady that he had been in a fight with someone, that someone had been stabbed in the fight, and that he had left a knife and a cooler in the woods. In addition, Defendant told Ms. Brady that Mr. Rufty had

been Ms. Propst's drug dealer and that Defendant did not like Mr. Rufty.

At approximately 3:45 p.m., Jacqueline Bush, who lived on a street parallel to Grubb Ferry Road, saw Mr. Rufty's vehicle beside the road. Ms. Bush did not call for emergency assistance. Almost simultaneously, Felicia Smith, who was employed as a nurse at Liberty Commons Health Care and was accompanied by her boyfriend, saw Mr. Rufty's car on the side of Grubb Ferry Road against a tree with its motor running as she traveled to take her vehicle to a mechanic. In light of her belief that a motor vehicle accident had occurred and the fact that the occupant of the vehicle did not respond when she blew her horn and yelled at him, Ms. Smith called for emergency assistance.

Upon arriving at the scene at which Mr. Rufty's car had been discovered shortly after 4:00 p.m., emergency medical personnel observed that Mr. Rufty's vehicle had collided with a tree at a low rate of speed and that Mr. Rufty, who had sustained lacerations to his neck, arms, head, and, hands, was unresponsive. In addition, emergency medical personnel observed that Mr. Rufty's seatbelt had been punctured and that there were copious amounts of wet and dried blood on Mr. Rufty's left torso. Mr. Rufty was pronounced dead at the scene, with his death having been caused by multiple stab wounds.

As they examined the scene at which Mr. Rufty's vehicle had been discovered, investigating officers spoke with someone who had called Mr. Rufty's telephone in an attempt to locate him and to ascertain if he was safe. In response to that call, the investigating officers set up a meeting with Mr. Witte and his girlfriend, Tonya Oliver. As a result of the conversations that they had with these individuals and another individual named Neal Rankin, the investigating officers decided to speak with Defendant and Ms. Propst, arrived at their residence at approximately 10:00 p.m., and discovered that Defendant was at home.

After the investigating officers told him that they were looking for Ms. Propst, Defendant asked if their interest in Ms. Propst was related to the stabbing incident and agreed to go to the Rowan County Sheriff's Office for the purpose of answering the officers' questions. During his conversation with the investigating officers, Defendant stated that he had been fishing during the morning because it was too early to purchase alcohol. A subsequent examination of Defendant's fishing rods revealed the presence of spider webs, a fact that suggested that they had not been used for some time. A DNA analysis of material taken from Defendant's shoes revealed the presence of Mr. Rufty's blood. The investigating officers never found

Defendant's shirt, knife, or cooler despite an intensive search of the area in which Mr. Rufty's vehicle was discovered.

## 2. Defendant's Evidence

Defendant had been involved in a romantic relationship with Ms. Propst for over 20 years. By June of 2010, the relationship between the two had become rocky because Ms. Propst would disappear for days at a time as the result of her drug consumption. In addition, Ms. Propst suffered from occasional hallucinations.

On 25 June 2010, Defendant lost his job at a mobile home manufacturing facility. On the following morning, he and Ms. Propst began their day by smoking crack cocaine. After finishing their supply of crack cocaine, Defendant and Ms. Propst went to purchase more cocaine from Mr. Rufty, to whom Ms. Propst introduced him on that occasion. After completing this cocaine transaction, Defendant and Ms. Propst returned to their home in order to use the drugs that they had purchased.

At a later time on that same morning, Defendant and Ms. Propst went to a BP service station. After Defendant finished paying for the fuel that he had bought, he discovered that Ms. Propst was no longer present. Instead, Ms. Propst had taken the Mazda, which they shared, leaving him stranded at the service station. Upon making this discovery, Defendant began calling Ms. Propst's cell phone in an attempt to find her. As a result

of the fact that he was unable to locate Ms. Propst, Defendant spent the remainder of the day drinking and consuming drugs.

On Sunday, 27 June 2010, Ms. Propst called Defendant and led him to believe that she had been raped. After speaking with Ms. Propst, Defendant obtained a ride to Mr. Ridenhour's residence. Defendant was upset at the time of his arrival at Mr. Ridenhour's house on the grounds that, even though Ms. Propst claimed that she had been raped, she was wearing a see-through shirt in the presence of three men.

After Defendant asked Ms. Propst for Mr. Rufty's number, he obtained it from Mr. Witte, whom he had not previously met. When his effort to contact Mr. Rufty by phone failed, Defendant left a message in which he informed Mr. Rufty that he wanted to speak with him about what happened during his encounter with Ms. Propst. Although Ms. Propst returned home with Defendant, she appeared to be unwilling to accept his suggestion that she needed to report Mr. Rufty's actions to a law enforcement agency and have a sexual assault examination conducted.

At the time that Defendant made contact with Mr. Rufty, the two men agreed to meet. Subsequently, Mr. Rufty came to the residence that Defendant shared with Ms. Propst. When Mr. Rufty arrived, Defendant greeted Mr. Rufty, gave him a beer, and got into his car. Defendant denied having a cooler in his

possession on that occasion and contended that he simply carried a number of beers in his hand.

After Defendant entered Mr. Rufty's vehicle, the two men consumed a couple of beers apiece and discussed Mr. Rufty's encounter with Ms. Propst. Defendant believed that Mr. Rufty was being honest during this discussion and was not angry at him given that Defendant had seen Ms. Propst appearing braless and wearing a see-through shirt in a house containing three men earlier that day.

Eventually, Mr. Rufty drove to a parking area behind a water plant off Grubb Ferry Road in order to meet someone. While the two men waited for the individual that they were supposed to meet, Defendant noticed Ms. Propst entering the area in their Mazda. At the time that Ms. Propst arrived, there were two other men in the vehicle, including Mr. Witte.

After the Mazda came to a stop, Mr. Witte exited the vehicle and began walking towards Mr. Rufty's car. As he did so, Mr. Witte told Defendant that he needed to speak with Mr. Rufty. In light of Mr. Witte's statement, Defendant walked towards the Mazda in order to ask Ms. Propst what was going on.

After reaching the location at which Ms. Propst was parked, Defendant heard Mr. Rufty yell, "I didn't do it." At that point, Mr. Witte exited Mr. Rufty's vehicle, which began to drive off with its tires "spinning." Defendant noticed that Mr.

Witte had blood on his hands and was holding a shiny object when he got out of Mr. Rufty's car. As Mr. Rufty drove away, Mr. Witte returned to the Mazda and reentered the vehicle, which drove away in a normal manner, leaving Defendant alone.

Shortly thereafter, Defendant heard Mr. Rufty's car crash at a location further down the road. As a result, he placed multiple calls to Ms. Propst in an attempt to find out what had happened and why he had been left by the side of the road. Subsequently, Defendant made contact with Ms. Brady, who came and picked him up.

Defendant denied telling Ms. Brady that he had been in a fight or that he had stabbed anyone. As a result of the fact that the day was an oppressively hot one, Defendant discarded his shirt before Ms. Brady picked him up. Although Defendant attempted to call the Rowan County Sheriff's Office in response to a voice mail message that he had received from an officer affiliated with that agency, he failed to make contact with the investigating officers because he had been calling the wrong number.

After returning home, Defendant put on a shirt and went to the fairgrounds to calm down. At approximately 10:30 p.m., investigating officers came to the residence that Defendant shared with Ms. Propst. Defendant allowed the investigating officers to search the residence and accompanied them to the

Sheriff's Office, where he submitted to an interview. During the course of the interview, Defendant falsely told the investigating officers that he had been fishing at the time that Mr. Rufty was killed.

## B. Procedural Facts

On 28 June 2010, a warrant for arrest charging Defendant with the murder of Mr. Rufty was issued. On 6 July 2010, the Rowan County grand jury returned a bill of indictment charging Defendant with the murder of Mr. Rufty. The charge against Defendant came on for trial before the trial court and a jury at the 29 October 2012 criminal session of the Rowan County Superior Court. On 9 November 2012, the jury returned a verdict convicting Defendant of first degree murder. On the same date, the trial court entered a judgment sentencing Defendant to a term of life imprisonment without the possibility of parole. Defendant noted an appeal to this Court from the trial court's judgment.

## II. Legal Analysis

In his sole challenge to the trial court's judgment, Defendant contends that the trial court erred by failing to submit the issue of his guilt of the lesser included offense of second degree murder to the jury. According to Defendant, the trial court should have allowed the jury to consider the issue of his guilt of second degree murder on the grounds that the

record contained sufficient evidence that a combination of Defendant's alcohol consumption, the fact that he was upset over the loss of his job and Ms. Propst's conduct, and the fact that he killed Mr. Rufty in a fight would have supported the submission of the issue of his guilt of second degree murder to the jury. We do not find Defendant's arguments to be persuasive.

## A. Relevant Legal Principles

According to well-established North Carolina law, the offense of first degree murder consists, among other things, of "the unlawful killing of another human being with malice and with premeditation and deliberation," while the lesser included offense of second degree murder consists of "the unlawful killing of another human being with malice but without premeditation and deliberation." *State v. Watson*, 338 N.C. 168, 176, 449 S.E.2d 694, 699 (1994) (citing N.C. Gen. Stat. § 14-17; *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991); and *State v. Robbins*, 309 N.C. 771, 775, 309 S.E.2d 188, 190 (1983)), *cert. denied*, 514 U.S. 1071, 115 S. Ct. 1708, 131 L. Ed. 2d 569 (1995), *overruled in part on other grounds in State v. Richardson*, 341 N.C. 585, 597, 461 S.E.2d 724, 731 (1995). "Premeditation means that [the] defendant formed the specific intent to kill the victim for some period of time, however short, before the actual killing," while "[d]eliberation means

that the intent to kill was formed while [the] defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation." *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E.2d 791, 795 (1981), *overruled on other grounds in State v. Weaver*, 306 N.C. 629, 640-41, 295 S.E.2d 375, 381-82 (1982), *overruled on other grounds in State v. Collins*, 334 N.C. 54, 61, 431 S.E.2d 188, 193 (1993). "[A] defendant who does not have the mental capacity to form an intent to kill, or to premeditate and deliberate upon the killing, cannot be lawfully convicted of murder in the first degree, whether such mental deficiency be due to a disease of the mind, intoxication, . . . or some other cause." *State v. Cooper*, 286 N.C. 549, 572, 213 S.E.2d 305, 320 (1975) (citing *State v. Alston*, 214 N.C. 93, 94, 197 S.E. 719, 720 (1938)), *disapproved on other grounds in State v. Leonard*, 300 N.C. 223, 230, 266 S.E.2d 631, 636, *cert. denied*, 449 U.S. 960, 101 S. Ct. 372, 66 L. Ed. 2d 227 (1980).

A trial court should instruct the jury concerning the issue of the defendant's guilt of a lesser included offense only if "there is evidence from which the jury could find that such included crime of lesser degree was committed." *State v. Ward*, 286 N.C. 304, 311, 210 S.E.2d 407, 413 (1974) (quoting *State v. Hicks*, 241 N.C. 156, 159, 84 S.E.2d 545, 547 (1954)), *vacated in part on other grounds*, 428 U.S. 903, 96 S. Ct. 3206, 49 L. Ed.

2d 1207 (1976). "Under North Carolina and federal law a lesser included offense instruction is required if the evidence 'would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater.'" *State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (quoting *State v. Strickland*, 307 N.C. 274, 286, 298 S.E.2d 645, 654 (1983), *overruled in part on other grounds in State v. Johnson*, 317 N.C. 193, 203, 344 S.E.2d 775, 781 (1986)). For that reason, "[t]he determinative factor is what the State's evidence tends to prove," with the trial court being required to "exclude from jury consideration the possibility of a conviction of second degree murder" "[i]f the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than [the] defendant's denial that he committed the offense." *Strickland*, 307 N.C. at 293, 298 S.E.2d at 658.

## B. Standard of Review

"[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "[A]n error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility

that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.'" *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (quoting N.C. Gen. Stat. § 15A-1443(a)).

## C. Evidentiary Analysis

In attempting to persuade us that the trial court should have allowed the jury to consider the issue of his guilt of second degree murder, Defendant contends that a combination of his alcohol consumption, the fact that he was emotionally upset as a result of the loss of his job and Ms. Propst's conduct, and the fact that he had been in a fight sufficed to support a determination that he was guilty of second degree murder rather than first degree murder. The fundamental problem with Defendant's argument is that a careful analysis of the record indicates the complete absence of any evidentiary support for such a conclusion.

As an initial matter, the record simply does not contain any evidence to show that Defendant's alcohol consumption had anything to do with the killing of Mr. Rufty. Although Defendant points to the fact that he had a cooler when he was at Mr. Ridenhour's home, that he purchased beer as soon as he could legally do so on the day of the killing, and that he had beer in his possession at the time that he rode off with Mr. Rufty, the

record contains no indication that Defendant's mental state was actually affected by any alcohol that he might have consumed. As a result, the fact that Defendant may have consumed alcohol at or around the time that Mr. Rufty was killed does not provide any support for Defendant's challenge to the trial court's refusal to allow the jury to consider the issue of Defendant's guilt of second degree murder.

Similarly, the fact that Defendant might have been upset by a number of factors, including the loss of his job, the deterioration of his relationship with Ms. Propst, and the manner in which Ms. Propst had been acting, does not support a determination that the trial court should have allowed the jury to consider the issue of Defendant's guilt of second degree murder. Simply put, the record contains no indication that Defendant was upset over the loss of his job, the status of his relationship with Ms. Propst, or the nature of the events in which Ms. Propst had been involved at the time of the killing of Mr. Rufty. Although the record does contain evidence tending to show that Defendant was exceedingly angry when he entered Mr. Ridenhour's residence several hours before the killing of Mr. Rufty, it is totally devoid of any indication that he continued to be angry after that point. On the contrary, Defendant testified that he was not angry with Mr. Rufty during the time that he spent in Mr. Rufty's vehicle in light of the manner in

which Ms. Propst had been dressed at the time that he entered Mr. Ridenhour's residence. As a result, the fact that Defendant had reason to be upset about a number of subjects does not provide any support for his claim that the trial court should have allowed the jury to consider the issue of his guilt of second degree murder.

Finally, the fact that Defendant claimed to have killed Mr. Rufty during a fight does not undercut the trial court's decision to refrain from instructing the jury concerning the issue of his guilt of the lesser included offense of second degree murder.

> "[A]lthough there may have been time for deliberation, if the purpose to kill was formed and immediately executed in a passion, especially if the passion was aroused by a recent provocation or by mutual combat, the murder is not deliberate and premeditated. However, passion does not always reduce the crime since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect." Thus a killing committed during the course of a quarrel or scuffle may yet constitute first degree murder provided the defendant formed the intent to kill in a cool state of blood before the quarrel or scuffle began and the killing during the quarrel was the product of this earlier formed intent.

*Misenheimer*, 304 N.C. at 113-14, 282 S.E.2d at 795 (alteration in original) (citations omitted) (quoting *State v. Faust*, 254 N.C. 101, 108, 118 S.E.2d 769, 773, *cert. denied*, 368 U.S. 851, 82 S. Ct. 85, 7 L. Ed. 2d 49 (1961)).  As we have already noted, all of the evidence contained in the present record tends to show that Defendant lured Mr. Rufty into coming to his residence and drove off with Mr. Rufty after telling Ms. Propst that she would need to come and retrieve him at a later time.  The mere fact that Defendant said that a fight occurred, without more, does not in any way detract from this compelling showing that he acted with premeditation and deliberation given the total absence of any information concerning the circumstances surrounding the manner in which the fight began or the events that occurred during the fight.  In fact, Defendant's statement is not in any way inconsistent with the idea that the "fight" occurred when Mr. Rufty attempted to defend himself from an attack launched by Defendant.  As a result, the record contains no support for Defendant's contention that the trial court should have allowed the jury to consider the issue of his guilt of the lesser included offense of second degree murder on the basis that he had been involved in a fight with Mr. Rufty.

In seeking to persuade us to reach a different result, Defendant relies on this Court's opinion in *State v. Beck*, 163 N.C. App. 469, 594 S.E.2d 94 (2004), *rev'd in part on other*

*grounds*, 359 N.C. 611, 614 S.E.2d 274 (2005). The evidence before this Court in *Beck* tended to show that the defendant killed a neighbor who had attacked him after the defendant had consumed alcohol. *Beck*, 163 N.C. App. at 471-72, 594 S.E.2d at 96. Although there are a limited number of surface similarities between the facts at issue in *Beck* and those at issue here, *Beck* is readily distinguishable from the present case given that the record in *Beck*, unlike the record before us in this case, contained evidence to the effect that the defendant was "very drunk" when he went to see the victim prior to the confrontation that resulted in the victim's death and that the victim had launched a physical attack upon the defendant. *Id.* at 473-74, 594 S.E.2d at 97. In this case, on the other hand, the record contains no indication that Defendant was intoxicated or emotionally upset at the time that Mr. Rufty was killed or that Mr. Rufty had initiated any sort of altercation with Defendant. As a result, whether the various arguments advanced by Defendant are taken singly or in combination, we conclude that the trial court did not err by declining to instruct the jury on the issue of Defendant's guilt of the lesser included offense of second degree murder.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court did not err by declining to instruct the jury

concerning the issue of Defendant's guilt of the lesser included offense of second degree murder.  As a result, the trial court's judgment should, and hereby does, remain undisturbed.

NO ERROR.

Judges GEER and STEPHENS concur.

Report per Rule 30(e).