IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-538

Filed 1 October 2025

Alamance County, No. 19CRS055308-000

STATE OF NORTH CAROLINA

       v.

JEREMIAH EZEIL HARDAWAY

Appeal by Defendant from Judgment entered 22 September 2023 by Judge Craig Croom in Alamance County Superior Court. Heard in the Court of Appeals 5 March 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Benjamin Szany, for the State.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Samuel J. Ervin, IV, for Defendant-Appellant.*

PER CURIAM

## Factual and Procedural Background

Jeremiah Ezeil Hardaway (Defendant) appeals from a Judgment entered upon a jury verdict finding him guilty of First-Degree Murder based on Felony Murder. The Record before us, including evidence presented at trial, tends to reflect the following:

Kalen Turner, Tyler Poteat, Jashaun Thompson, and Defendant were high school classmates and were mutual acquaintances with Lamona Boone. Several

months prior to the underlying incident in this case, Turner and Thompson had a falling out over an accusation Turner made about Thompson to Boone, who was in a relationship with Thompson at the time. Multiple public confrontations ensued with Turner and Poteat on one side and Thompson and Defendant on the other.

On 8 September 2019, Defendant and Thompson saw and approached Turner, Poteat, and Cazaria Russell in a Walmart. Turner suggested they take their fight outside, but after leaving the Walmart, Turner Poteat, and Russell went to a friend's house. The argument continued online through messages on a social media platform. In one message, Turner told Defendant and Thompson "if you all got an issue you all know where I am at. Pull up."

That evening, a group of people in two or three cars, including Defendant and Thompson, drove up to the house where Poteat and Turner were. Thompson and Turner immediately engaged in a physical altercation. Defendant ran to confront Poteat, but the two were separated. Defendant then ran to a car, got a gun, and began waving it around. After someone said they were calling the police, Defendant and several others left. The next morning, 9 September 2019, Defendant messaged Turner that "we can do a round two if you feel like we jumped you." Turner agreed to another fight.

In the evening of 9 September 2019 after an unsuccessful attempt at a fight, Poteat, Russell, Russell's brother Myson, and several others were walking to Turner's house when Defendant passed them in his black PT Cruiser along with two other cars

"full of people[.]"  Defendant had repeatedly messaged Turner asking him where he was.  Once Poteat and his group arrived at Turner's house they sat on the porch. Three cars occupied by Defendant, Thompson, and others drove by again.  This group drove to a nearby church parking lot and rearranged themselves among the vehicles, with Defendant and Thompson in a car driven by Warren Mongo.  According to Thompson, Mongo, and another witness, Defendant sat in the front passenger seat.

Although the group decided to "go back home and leave the situation alone," they still drove past Turner's house.  As the vehicles slowly drove past Turner's home, multiple witnesses heard gunshots.  Poteat testified he heard a shot, saw Defendant "holding a gun," and saw "sparks" before he "took off."  Russell testified to hearing "at least five or six shots" and ducking down.  As the vehicle slowed, Turner testified he saw Defendant's eyes before "the fire started from the gun started coming out." Mongo testified he saw a gun in Defendant's hand immediately after shots had been fired.  Thompson testified he saw Defendant "place his hand out of the window" and saw the gun, "[t]he flash then followed after the gunshots."

Myson Russell sustained a gunshot wound to the chest.  He subsequently died from that wound.  Police found five shell casings in the street near the scene of the incident and a sixth in a grassy area just off the edge of the road.  At trial, Detective Adam Snow with the Burlington Police Department testified the spread of the shell casings indicated "they had been shot from something that was moving[.]"  Police also discovered a fresh bullet hole in Mr. Turner's residence on the side that faced the

street where the shell casings were found. Turner's niece was present in the home at the time of the shooting.

On 23 September 2019, Defendant was indicted for First-Degree Murder and Discharging a Weapon Into an Occupied Dwelling. On 26 September 2023, the State voluntarily dismissed the Discharging a Firearm Into an Occupied Dwelling charge. This case came on for trial on 12 September 2023.

During jury selection, the State simultaneously exercised three peremptory challenges: to Eric M, a Black man, Nelson N, a Hispanic man of Mexican heritage, and Brandy F, a white woman. Defendant objected to the challenge of Mr. Moore and Mr. Navarro under *Batson v. Kentucky*. The trial court found Defendant had made a prima facie showing of discrimination and held a *Batson* hearing. The State proffered facially race-neutral reasons for the challenge, and the trial court found those reasons credible and held Defendant had not shown purposeful discrimination, overruling the *Batson* challenge.[1]

At trial, the State sought to present evidence to support the charge of First-Degree Murder based on premeditation and deliberation and based on felony murder. The State submitted three predicate felonies in support of the felony murder theory: Assault With a Deadly Weapon With Intent to Kill, Firing Into an Occupied Dwelling, and Discharging a Firearm Within a Motor Vehicle. At the close of the State's

---

[1] On appeal, Defendant raises a *Batson* issue only as to Eric M.

evidence, Defendant moved to dismiss all charges based on insufficient evidence. The trial court denied the Motion. Defendant renewed his Motion to Dismiss after declining to present evidence, and the trial court again denied the Motion.

During the charge conference on the jury instructions, defense counsel objected to the submission of all three predicate felonies: "We would object to all three particularly in light that the defense prior to trial asked that the State disclose what theories they were pursuing and at that time they only mentioned those that were charged under premeditation, deliberation, and the discharging into an occupied dwelling." Defense counsel also stated, "I don't think . . . all the elements are satisfied, particularly with the felony murder rule portion or felony or murder in the perpetration of a felony components." The trial court determined instruction on all three predicate felonies was proper and instructed the jury accordingly. The trial court also instructed the jury: "You must be unanimous that the defendant committed or attempted to commit one of these felonies and that the defendant had the intent to commit that felony, but you need not be unanimous as to which one the defendant committed or attempted to commit."

On 22 September 2023, the jury returned a verdict finding Defendant guilty of First-Degree Murder based on Felony Murder. The verdict form did not require the jury to specify which predicate felony or felonies supported the conviction. The trial court entered a Judgment sentencing him to life imprisonment without possibility of parole.

**Issues**

The issues on appeal are whether: (I) Defendant's challenges to the denial of his Motions to Dismiss were preserved for appellate review; (II) the trial court erred by denying Defendant's Motions to Dismiss and instructing the jury on each of the predicate felonies charged; or (III) the trial court erred by overruling Defendant's *Batson* objection.

**Analysis**

I.   Preservation

As a threshold matter, the State argues Defendant failed to properly preserve his challenge to the sufficiency of the evidence because, in the State's view, his objection at trial rested exclusively on a lack of pretrial notice. We disagree.

Our Rules of Appellate Procedure provide: "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. Rule 10(a)(1) (2024). Further, our Supreme Court has held "[b]ecause our case law places an affirmative duty upon the trial court to examine the sufficiency of the evidence against the accused for every element of each crime charged, it follows that, under Rule 10(a)(3), a defendant's motion to dismiss preserves all issues related to sufficiency of the State's evidence for appellate review." *State v. Golder*, 374 N.C. 238, 246, 839 S.E.2d 782, 788 (2020).

During the charge conference, the trial court asked defense counsel whether he would like to be heard on the predicate felonies. Counsel for Defendant responded: "We would object to all three. We would object to all three particularly in light that the defense prior to trial asked that the State disclose what theories they were pursuing and at that time they only mentioned those that were charged under premeditation, deliberation, and the discharging into [a]n occupied dwelling." Further, during the charge conference but prior to the above express objections, counsel for Defendant argued "I don't think . . . all the elements are satisfied, particularly with the felony murder rule portion or felony or murder in the perpetration of a felony components. . . . The only evidence presented by the State is that the shooter was shooting into the air. And so I think there is certainly argument both ways on a lot of these elements and it's not sufficient or fully satisfied by the State's evidence."

Additionally, Defendant moved to dismiss the charges against him at the close of the State's evidence, and again after the close of all evidence. At the close of the State's case in chief, Defendant contended the State had not presented sufficient evidence to support the murder charges and the discharging a firearm into an occupied dwelling charge. Counsel for Defendant expressly argued "as far as the occupied dwelling goes, there's not been any evidence at all, not one scintilla of evidence as they say, that any bullet fired from that vehicle at all struck this building." Defense counsel likewise challenged the sufficiency of the evidence for

7

First-Degree Murder and argued, "even given the benefit of all reasonable inferences that the jury could not come back with a guilty beyond a reasonable doubt in both of these charges." And, indeed, the State's response to these arguments was that there was sufficient evidence to support each charge, including sufficient evidence to support the three predicate felonies it alleged. Thus, the sufficiency of the evidence to support the First-Degree Murder charge, including the three predicate felonies alleged, was submitted to the trial court for consideration. Therefore, Defendant's challenge to the sufficiency of the evidence to support the First-Degree Murder charge was preserved for appellate review.

II.     Sufficiency of the Evidence

Defendant contends the trial court erred by instructing the jury because there was insufficient evidence to support the three alleged predicate felonies: Assault with a Deadly Weapon with Intent to Kill (AWADWWIK), Firing Into an Occupied Dwelling, and Discharging a Firearm Within a Motor Vehicle. "[A] trial judge should not give instructions to the jury which are not supported by the evidence produced at the trial." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973) (citations omitted).

"[U]npreserved issues related to jury instructions are reviewed under a plain error standard, while preserved issues are reviewed under a harmless error standard." *State v. Collington*, 375 N.C. 401, 410, 847 S.E.2d 691, 698 (2020) (citations omitted). As we determined *supra*, Defendant's challenges to the jury

instructions were preserved for appeal. Thus, we apply harmless error review. "[H]armless-error review requires a defendant show that 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises,' unless the error relates to a constitutional right." *State v. Leaks*, 379 N.C. 57, 62, 864 S.E.2d 217, 220 (2021) (quoting N.C. Gen. Stat. § 15A-1443(a)). Defendant has not alleged violation of a constitutional right; therefore, he bears the burden of showing prejudice. *State v. Lawrence*, 365 N.C. 506, 513, 723 S.E.2d 326, 331 (2012) (citing N.C. Gen. Stat. § 15A-1443(a)).

Here, Defendant sought to dismiss the First-Degree Murder charge at the close of the State's evidence and after his case-in-chief based on insufficient evidence. "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Wilson*, 269 N.C. App. 648, 651, 839 S.E.2d 438, 441 (2020) (citation omitted). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984).

"If the evidence is sufficient only to raise a suspicion or conjecture as to either

the commission of the offense or the identity of the defendant as the perpetrator of it, the motion [to dismiss] should be allowed." *Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455 (citation omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994) (citing *State v. Sumpter*, 318 N.C. 102, 107, 347 S.E.2d 396, 399 (1986)). "Only defendant's evidence which does not contradict and is not inconsistent with the state's evidence may be considered favorably to [the] defendant if it explains or clarifies the state's evidence or rebuts inferences favorable to the state." *Sumpter*, 318 N.C. at 107-08, 347 S.E.2d at 399. However, "[w]hether the State has offered such substantial evidence is a question of law for the trial court." *State v. McKinney*, 288 N.C. 113, 119, 215 S.E.2d 578, 583 (1975) (citations omitted).

Here, Defendant was charged with Felony Murder. "Felony murder elevates a homicide to first-degree murder if the killing is committed in the perpetration or attempted perpetration of certain felonies or any 'other felony committed or attempted with the use of a deadly weapon[.]'" *State v. Frazier*, 248 N.C. App. 252, 262, 790 S.E.2d 312, 320 (2016) (quoting N.C. Gen. Stat. § 14-17(a)). The State put forward three different predicate felonies upon which the jury could base a conviction for Felony Murder: AWADWWIK, Firing Into an Occupied Dwelling, and Discharging a Firearm Within a Motor Vehicle. We address each in turn.

10

A.      *AWADWWIK and Firing Into an Occupied Dwelling*

"[T]he elements of assault with a deadly weapon with intent to kill are: '(1) an assault; (2) with a deadly weapon; (3) with the intent to kill.' " *State v. Garris*, 191 N.C. App. 276, 287, 663 S.E.2d 340, 349 (2008) (quoting *State v. Coria*, 131 N.C. App. 449, 456, 508 S.E.2d 1, 5 (1998)).  An assault is "an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *State v. Roberts*, 270 N.C. 655, 658, 155 S.E.2d 303, 305 (1967).

"A specific intent to kill is an essential element of assault with a deadly weapon with intent to kill[.]" *State v. Daniel*, 333 N.C. 756, 763, 429 S.E.2d 724, 729 (1993) (citations omitted).  However, "an intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances." *State v. Barlowe*, 337 N.C. 371, 379, 446 S.E.2d 352, 357 (1994).  "Where the defendant points a gun at the victim and pulls the trigger, this constitutes evidence from which intent to kill may be inferred." *State v. Cromartie*, 177 N.C. App. 73, 77, 627 S.E.2d 677, 680 (2006); *see also State v. Patton*, 115 N.C. 753, 756, 20 S.E. 538, 539 (1894) ("[W]hen the statute makes the 'intent to kill' an essential element of the offense, the intent to shoot will be held synonymous with the intent to kill.").

Our statutes describe the offense of Firing Into an Occupied Dwelling, in

pertinent part, as follows:

> (a) Any person who willfully or wantonly discharges or attempts to discharge any firearm or barreled weapon capable of discharging shot, bullets, pellets, or other missiles . . . into any building, structure, . . . or enclosure while it is occupied is guilty of a Class E felony.
>
> (b) A person who willfully or wantonly discharges a weapon described in subsection (a) of this section into an occupied dwelling . . . is guilty of a Class D felony.

N.C. Gen. Stat. § 14-34.1(a)-(b) (2023). Thus, the elements of this offense are: "(1) willfully and wantonly discharging (2) a firearm (3) into property (4) while it is occupied." *State v. Rambert*, 341 N.C. 173, 175, 459 S.E.2d 510, 512 (1995) (citation omitted).

Defendant's contention as to each of these offenses is the same: he argues the Record does not reflect evidence he fired "at" anyone or at Turner's house. We disagree.

The Record reflects Poteat testified that he saw Defendant holding a gun and saw the gun discharge. Turner testified to seeing Defendant firing a gun. Another witness, Warren Mongo, stated he saw a gun in Defendant's hand immediately after hearing multiple shots fired. Further, the evidence reflected Russell was shot and died from a gunshot wound. Likewise, the evidence tended to show a bullet entered Turner's residence. Defendant concedes there was reason to believe, given the time of day the shooting occurred, that Turner's residence might be occupied. Thus, there is sufficient evidence from which the jury could infer Defendant was the shooter and

12

that bullets from the gun he fired hit Russell, as well as Turner's house. The remaining question as Defendant poses it—whether Defendant fired "at" anyone or anything—is a question of fact for the jury. *See U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 572, 97 S. Ct. 1349, 1355, 51 L. Ed. 2d 642 (1977) ("[I]n a jury trial the primary finders of fact are the jurors.").

Thus, the evidence, taken in the light most favorable to the State, was sufficient to submit the charges of AWADWWIK and Firing Into an Occupied Dwelling to the Jury. Therefore, the trial court did not err in denying Defendant's Motions to Dismiss and submitting these charges to the jury.

B.      *Discharging a Firearm Within a Motor Vehicle*

Our statutes provide: "Unless covered under some other provision of law providing greater punishment, any person who willfully or wantonly discharges or attempts to discharge a firearm within any occupied building, structure, motor vehicle, or other conveyance, erection, or enclosure with the intent to incite fear in another shall be punished as a Class F felon." N.C. Gen. Stat. § 14-34.10 (2023). The elements of this offense are thus (1) willfully or wantonly discharging; (2) a firearm; (3) within a motor vehicle; (4) with the intent to incite fear in another person.

Defendant contends there was insufficient evidence as to the third element— that he discharged the firearm *within* the car. He argues the use of the word "within" as used in the statute requires a showing that the requisite conduct occurred inside a single structure—that it "encompasses an event occurring inside the covered

conveyance rather than emanating from it." He argues the language of the statute is clear and unambiguous, and that the Legislature's intent is additionally evidenced by its use of different language in related statutes. The evidence, taken in the light most favorable to the State, tended to show Defendant had fired from a vehicle into Kalen Turner's house. Defendant argues the act of firing from a vehicle into another structure is more appropriately described by language contained in other provisions, including Section 14-34.1 of our General Statutes which criminalizes discharging a firearm *into* a building or structure, or Section 14-34.9, which criminalizes discharging a firearm "*from within* any building, structure, motor vehicle, or other conveyance, erection, or enclosure toward a person not within that enclosure[,]"and the existence of these statutes indicates the Legislature did not intend Section 14-34.10 to govern the conduct at issue in this case.

This Court recently addressed this question in *State v. Jenkins*, __ N.C. App. __, __ S.E.2d __ (COA 24-889, 2025 WL 2232043). In that case, the defendant discharged a firearm from a vehicle into another vehicle, injuring the driver. *Id.* at *2. Like Defendant, he was convicted under Section 14-34.10. *Id.* at *4. We upheld that conviction, holding that because the defendant was within an enclosure when he discharged the firearm his conduct was contemplated by the statute, regardless of whether the victim was within that same enclosure. *Id.* at *5. "Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by

a higher court. *In re Civil Penalty,* 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). Defendant's argument is foreclosed by our precedent. The evidence at trial therefore supported a jury instruction regarding Discharging a Firearm Within a Motor Vehicle and the trial court did not err by denying the Motion to Dismiss and so instructing the jury.

III.    Defendant's *Batson* Objection

Defendant also argues the trial court erred by denying his *Batson* challenge. The State exercised a peremptory challenge as to Eric M, a Black man, and Defendant objected to this challenge under *Batson v. Kentucky,* 476 U.S. 79, 90 L.Ed.2d 69 (1986).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Batson v. Kentucky*, 476 U.S. at 79. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499, 197 L.Ed.2d 1 (2016). Article I, Section 26 of the North Carolina Constitution likewise prohibits the State from using peremptory challenges for racially discriminatory reasons. *State v. Augustine*, 359 N.C. 709, 715, 616 S.E.2d 515, 521 (2005).

"When a defendant claims that the State has exercised its peremptory

challenges in a racially discriminatory manner, a trial court conducts a three-step analysis pursuant to the decision of the Supreme Court of the United States in *Batson v. Kentucky*." *State v. Hobbs*, 374 N.C. 345, 349-50, 841 S.E.2d 492, 497 (2020).

> First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge. If the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge. Finally, the trial court must decide whether the defendant has proved purposeful discrimination.

*State v. Taylor*, 362 N.C. 514, 527, 669 S.E.2d 239, 254 (2008) (citations omitted).

Here, Defendant noted the State had challenged the only Black prospective juror on the panel and the trial court accordingly concluded he had made a prima facie showing of discrimination. The State then offered facially race-neutral explanations for exercising the challenge: that Eric M appeared "uninterested" and "not attentive," that he "seemed to have been annoyed to be here and that he appeared . . . to not be listening." We now address *Batson's* third step and determine if the trial court erred in determining Defendant has not shown purposeful discrimination.

"When reviewing a trial court's *Batson* analysis, 'a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.'" *State v. Cuthbertson*, 288 N.C. App. 388, 396, 886 S.E.2d 882, 888-89 (2023) (quoting *Snyder v. Louisiana,* 552 U.S. 472, 477, 170 L.Ed.2d 175 (2008)). Clear error exists when "on the entire evidence, the Court is left with the definite and firm conviction that a mistake has been committed." *Id.* This deferential standard reflects an

16

understanding that trial courts are "in the best position to assess the prosecutor's credibility." *Id*

In the third step of the *Batson* analysis, trial courts determine whether the prosecutor's proffered reasons are pretextual: "[t]he ultimate inquiry is whether the State was motivated in substantial part by discriminatory intent." *Hobbs* at 353, 841 S.E.2d at 499 (citations omitted). Trial courts use an open-ended list of factors to determine whether the defendant has met the burden of proving purposeful discrimination, including:

> Statistical evidence about the prosecutor's use of peremptory strikes against Black prospective jurors as compared to white prospective jurors in the case;
>
> Evidence of a prosecutor's disparate questioning and investigation of Black and white prospective jurors who were not struck in the case
>
> Side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not struck in the case
>
> A prosecutor's misrepresentation of the record when defending the strikes during the *Batson* hearing
>
> The susceptibility of the case to racial discrimination
>
> Relevant history of the State's peremptory strikes in past cases; or
>
> Other relevant circumstances that bear upon the issue of racial discrimination.

*Cuthbertson,* 288 N.C. App. at 403, 886 S.E.2d at 893.

The trial court must "consider all of the evidence before it when determining

17

whether to sustain or overrule a *Batson* challenge." *Hobbs* at 358, 841 S.E.2d at 502. It must "explain how it weighed the totality of the circumstances surrounding the prosecution's use of peremptory challenges[,]" including engaging in a "comparative juror analysis of the prospective juror's voir dire responses." *Id.* at 360, 841 S.E.2d at 503.

In this case, the State removed the only Black juror who had yet participated in voir dire. This statistical evidence may favor a finding of purposeful discrimination, but we note that "bare statistics" do not carry as much weight as other factors, particularly as a small sample size can skew strike and acceptance rate data. *Cuthbertson* at 404-05, 886 S.E.2d at 893 (citing *Miller-El v. Dretke,* 545 U.S. 231, 241, 162 L.Ed.2d 196 (2005)).

Several of the enumerated factors do not support a finding of purposeful discrimination in this case. The trial court found the prosecutor had not misrepresented the record in defending the peremptory strike. There was no evidence the case was particularly susceptible to racial discrimination: in making this determination, we focus on the "race of the defendant, the victims, and the key witnesses" and "whether the case crosses racial lines among those key figures." *State v. Bennett,* 282 N.C. App. 585, 621, 871 S.E.23d 831, 856 (2022) (citation omitted). The Defendant in this case is Black, but at the time of the *Batson* hearing there was no indication of the race of the victim or key witnesses. There was no indication of disparate questioning of jurors. Defendant does not argue, at trial or on appeal, that

18

these factors support a finding of purposeful discrimination.

The sole factor Defendant raises in support of a finding of purposeful discrimination is a comparison between Eric M and Nathan J, a white juror who was not struck. During the *Batson* hearing, the State explained its strike by describing Eric M's demeanor:

> Ms. Burnick was tasked with observing the reactions of the jurors as I asked questions as I was taking notes on their answers and such. And what she observed about it was that [Eric M] was uninterested. That she observed matters of his body language that showed he was not attentive. That he seemed to have been annoyed to be here and that he appeared to her to be not listening.

In response, Defendant identified behavior exhibited by Nathan J:

> I submit to Your Honor that Juror No. 5, [Nathan J], gave nothing but one word answers the entire time with every question that he was asked. . . . And subjectively someone could say, oh, well, he looks like he doesn't want to be here. He's giving these one word answers and not very communicative, if you will, with his body language.

We note that explanations based on demeanor "are particularly susceptible to the kind of abuse prohibited by *Batson*." *United States v. Diaz*, 26 F.3d 1533, 1543 (1994). However, "[t]he trial judge [is] in the best position to resolve this issue" because the trial court can observe the prospective juror's "facial expressions, tone of voice, reactions, and other nuances that are not subject to translation when reviewing a cold record on appeal." *State v. McClain*, 169 N.C. App. 657, 669, 610 S.E.2d 783, 791 (2005). In this case, the trial court found the prosecutor's explanation credible.

Nathan J's behavior as identified by Defendant is not directly analogous to that of Eric M. Defendant identifies only Nathan J's "one word answers" and body language as indicating "he doesn't want to be here." The State's concern regarding Eric M was not only that he was "annoyed to be here" but that he was "uninterested," "not attentive," and "appeared . . . to be not listening." A prospective juror's "general lack of attention" is a valid reason for the State to exercise a peremptory challenge. *State v. Caporasso,* 128 N.C. App. 236, 244, 495 S.E.2d 157, 162 (1998). Defendant has not shown this reason to be pretextual, and the trial court did not clearly err in finding the proffered explanation credible.

After reviewing all of the relevant facts and circumstances, we determine that the trial court did not commit clear error in concluding the peremptory strike of Eric M was not motivated in substantial part by discriminatory intent. *Clegg*, 380 N.C. at 144, 867 S.E.2d at 900. We are not "left with the definite and firm conviction that a mistake has been committed." *Bennett,* 282 N.C. App. at 600, 871 S.E.2d at 844. Therefore, the trial court did not err in denying Defendant's *Batson* objection.

## Conclusion

Accordingly, for the foregoing reasons, we conclude there was no error in Defendant's trial and affirm the Judgment.


NO ERROR.

Chief Judge DILLON concurs by separate opinion.

Judge HAMPSON concurs in result only by separate opinion.

Judge GRIFFIN concurs.

HAMPSON, Judge, concurring *dubitante.*

Although we are bound by the previous decision of this Court in *State v. Jenkins*, __ N.C. App. __, __ S.E.2d __ (COA 24-889, 2025)[2], I believe that opinion incorrectly interpreted the statute at issue and was wrongly decided. The panel in *Jenkins* eschewed a plain text analysis of N.C. Gen. Stat. § 14-34.10 (2023) and discarded the clear legislative intent. Instead, that panel rewrote the statute to reach the conclusion the term "within" actually meant "without."

Let's start at the beginning—with the actual text of the statute. The text of Section 14-34.10, entitled "Discharge Firearm Within Enclosure to Incite Fear," reads:

> Unless covered under some other provision of law providing greater punishment, any person who willfully or wantonly discharges or attempts to discharge a firearm within any occupied building, structure, motor vehicle, or other conveyance, erection, or enclosure with the intent to incite fear in another shall be punished as a Class F felon.

N.C. Gen. Stat. § 14-34.10 (2023). Thus, the elements of this offense are: (1) willfully or wantonly discharging; (2) a firearm; (3) within a motor vehicle; (4) with the intent to incite fear in another person. *See id.*

As Defendant notes, the critical word in this statutory provision is "within". Although we are without caselaw defining "within" for the purposes of statutory construction, other relevant sources define it as "inside the limits of," BLACK'S LAW

---

[2] *See In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989).

DICTIONARY 1602 (6th ed. 1990), or "in or into the interior" and "a function word to indicate enclosure or containment." MERRIAM-WEBSTER'S DICTIONARY (2025). Thus, giving the term "within" its plain meaning, Section 14-34.10 refers to an incident occurring inside a covered conveyance—not merely emanating from it. The plain text of Section 14-34.10 criminalizes discharging a firearm *within* an enclosure, not firing from one enclosure into another.

Indeed, the legislative history and contrast with the companion statute make this clear. The intent of the Legislature is additionally clearly indicated by its use of different, more specific language in provisions within the same Article which criminalize discharging a firearm *into* an occupied enclosure (N.C. Gen. Stat. § 14-34.1) or *from within* an enclosure (N.C. Gen. Stat. § 14-34.9).

"The goal of statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment." *State v. Rankin*, 371 N.C. 885, 889, 821 S.E.2d 787, 792 (2018) (citing *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 276-77 (2005)). "Therefore, we must construe the statute while mindful of the criminal conduct that the legislature intends to prohibit." *Id.* (citing *In re Banks*, 295 N.C. 236, 240, 244 S.E.2d 386, 389 (1978)). "The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish." *State v. Langley*, 371 N.C. 389, 395, 817 S.E.2d 191, 196 (2018) (quoting *Midrex. Techs., Inc. v. N.C. Dep't of*

*Revenue*, 369 N.C. 250, 258, 794 S.E.2d 785, 792 (2016)).  Although certain forms of legislative history are disfavored in this State, *see N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 202, 675 S.E.2d 641, 650 (2009) ("[T]his Court does not look to the record of the internal deliberations of committees of the legislature considering proposed legislation." (citation omitted)) and *State ex rel. N.C. Milk Comm'n v. Nat'l Food Stores, Inc.*, 270 N.C. 323, 332-33, 154 S.E.2d 548, 555 (1967) (explaining courts may not consider "[t]estimony, even by members of the Legislature which adopted the statute, as to its purpose and . . . construction[.]"), others sources may be more reliable.  For example, statutory history—changes the General Assembly has made to a statutory text over time—has been noted as a more reliable source of legislative intent.  *Wynn v. Frederick*, 385 N.C. 576, 582, 895 S.E.2d 371, 377 (2023) ("[T]he legislature's intent may be revealed from the legislative history of the statute in question, as changes the legislature makes to a statute's text over time provide evidence of the statute's meaning." (citation omitted)), *reh'g denied*, 896 S.E.2d 254 (N.C. 2024).

Compare the instant statute with the statute immediately preceding it.  That provision, titled "Discharging a Firearm From Within an Enclosure," states: "[A]ny person who willfully or wantonly discharges or attempts to discharge a firearm, as a part of criminal gang activity, *from within* any building, structure, motor vehicle, or other conveyance, erection, or enclosure toward a person or persons *not within* that

enclosure shall be punished as a Class E felon." N.C. Gen. Stat. § 14-34.9 (2023) (emphasis added). There are two significant differences between the statutes that underscore our interpretation. First, the present statute refers to "discharg[ing] a firearm *within*" a vehicle, while the previous section addresses "discharg[ing] a firearm . . . *from within*" a vehicle. This distinction signals an intention to address two different incidents, with the present statute concerning the dangers of discharging a weapon inside of an enclosed space while the second concerns "drive by" shootings and similar incidents. Further, Section 14-34.9 clearly identifies the contemplated victims: persons *not* inside the same structure as the shooter (". . . toward a person or persons not within that enclosure[.]") (emphasis added). In contrast, the present section's only reference to potential victims is its reference to the discharge of a firearm "within any *occupied* building, structure, motor vehicle, or other conveyance[.]" N.C. Gen. Stat. § 14-34.10 (2023) (emphasis added). Thus, the only victims contemplated are other persons within the same enclosure as the shooter.

The differences between these two otherwise similar statutes underscore the General Assembly's intent to criminalize two distinct incidents: one in which a defendant fires a weapon from one enclosure into another, and one in which a defendant fires a weapon within an enclosed space. Further, although the plain text is sufficient to support our interpretation, it bears mention that in the process of

passing the bill to enact Section 14-34.10, the Judiciary Committee proposed a substitute bill, which the Senate adopted, changing the name of the bill from "An Act to Make it a Criminal Offense to Discharge a Firearm *From Within* an Enclosure With the Intent to do Harm or Incite Fear" to "An Act to Make it a Criminal Offense to Discharge a Firearm *Within* an Enclosure With the Intent to Incite Fear." N.C. Sen. J., 2013 1st Sess. No. 41 (emphasis added). This change indicates the General Assembly's choice to limit the present section to "within" as opposed to "from within" was considered and intentional. Although this is not identical to a situation where the General Assembly adopts changes to a previously enacted statute, it is similarly a change the legislature clearly agreed to and enacted, as opposed to the "internal deliberations" of a legislative proceeding. *See N.C. Dep't of Corr.*, 363 N.C. at 202, 675 S.E.2d at 650.

We have previously distinguished the conduct required to support a conviction under Section 14-34.10 from other, similar conduct. In *State v. McLean,* for example, the defendant was charged with Discharging a Firearm Within an Enclosure to Incite Fear. 251 N.C. App. 850, 796 S.E.2d 804 (2017). However, the indictment alleged the defendant "did discharge a handgun, a firearm, *into* an occupied structure with the intent to incite fear in others." 251 N.C. App. at 854, 796 S.E.2d at 807. We held the indictment did not sufficiently charge the defendant with discharging a firearm within an enclosure to incite fear, and noted the conduct was better described under

Section 14-34.1, "Discharging Certain Barreled Weapons or a Firearm into Occupied Property." *Id.* While in this case the evidence tends to show Defendant fired into one enclosure from another, as in *McLean* it is clear the Legislature did not intend Section 14-34.10 to describe that conduct because other, related statutes govern firing from within or into an enclosure.

Thus, correctly interpreted, Section 14-34.10 refers exclusively to the discharging of a firearm inside of an enclosed structure, not the discharge of a firearm emanating from an enclosed structure. Here, the Record evidence, taken in the light most favorable to the State, reflects the shots fired in this incident were from a vehicle rather than within one. The only testimony directly regarding the position of the gun at the time of the shooting was Thompson's testimony at multiple points that he saw the gun in Defendant's hand "[a]s it was poking out the window" and that he saw Defendant "place his hand out the window and that's when I [saw] the gun." That the State points to this testimony in support of its position reflects an understanding of the statute at odds with its plain meaning. Although this might reflect that the firearm was partially within the car, this testimony does not support an inference the gun was fired entirely within an enclosed space; in fact, it clearly suggests the gun was at least partially *outside* the car and firing toward another structure—which is precisely the conduct an entirely different statute—Section 14-34.9—contemplates.

Further, the State points to Turner's testimony the windows of the car were

"cracked" at the time of the shooting. But the State itself writes in briefing this testimony could reasonably support an inference "that the gun was fired *from within* the car." The evidence in the Record does not support an inference Defendant discharged a weapon inside the enclosed vehicle under N.C. Gen. Stat. § 14-34.10 as properly interpreted. Thus, even viewed in the light most favorable to the State, under this understanding of the statute there was not substantial evidence Defendant committed the offense. Under this interpretation, the trial court should have allowed Defendant's Motion to Dismiss as to this charge and declined to submit the offense as a predicate felony for Felony Murder.

Still, "[t]he defendant is not entitled to a new trial based on trial errors unless such errors were material and prejudicial." *State v. Alston*, 307 N.C. 321, 339, 298 S.E.2d 631, 644 (1983) (citing *State v. Billups*, 301 N.C. 607, 613, 272 S.E.2d 842, 847 (1981)). Because Defendant's objection to the jury instruction was preserved, we apply harmless error review. *State v. Collington*, 375 N.C. 401, 410, 847 S.E.2d 691, 698 (2020). Here, the trial court instructed the jury that, while it had to be unanimous in finding Defendant committed or attempted to commit one of the three predicate felonies submitted, it need not be unanimous as to which offense Defendant committed or attempted to commit. The verdict form did not require the jury to specify which predicate felony or felonies it found in support of the conviction for Felony Murder, nor was the jury asked at any point which predicate felony or felonies

it found. Absent that information, we cannot say definitively that no juror found Discharging a Firearm Within an Occupied Vehicle as the only predicate felony. Had that occurred, because this charge was impermissibly submitted to the jury, the result would be a verdict that was not unanimous.

"The United States Supreme Court has long recognized that a conviction cannot stand merely because it could have been supported by one theory submitted to the jury if another, invalid theory also was submitted and the jury's general verdict of guilty does not specific the theory upon which the jury based its verdict." *State v. Belton*, 318 N.C. 141, 164, 347 S.E.2d 755, 769 (1986), *overruled on other grounds*, *State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1997). In *State v. Petersilie* our Supreme Court considered a case in which it determined one of the two theories of guilt on which the jury was instructed was erroneous. 334 N.C. 169, 432 S.E.2d 832 (1993). There, the Court concluded: "Because the trial court incorrectly instructed the jury regarding one of two possible theories upon which defendant could be convicted and it is unclear upon which theory or theories the jury relied in arriving at its verdict, we must assume the jury based its verdict on the theory for which it received an improper instruction." *Id.* at 193, 432 S.E.2d at 846 (citations omitted).

Likewise, our Supreme Court reached the same conclusion in *State v. Pakulski*, 319 N.C. 562, 356 S.E.2d 319 (1987). In that case, the defendant was charged with felony murder and the State alleged two different predicate felonies: felony breaking

or entering and armed robbery. *Id.* at 567, 356 S.E.2d at 322. The Court determined breaking or entering, as alleged in that case, could not serve as a predicate felony for felony murder. *Id.* at 573, 356 S.E.2d at 326. Our Supreme Court then concluded "Where the trial judge has submitted the case to the jury on alternative theories, one of which is determined to be erroneous and the other properly submitted, and we cannot discern from the record the theory upon which the jury relied, this Court will not assume that the jury based its verdict on the theory for which it received a proper instruction. Instead, we resolve the ambiguity in favor of the defendant." *Id.* at 574, 356 S.E.2d at 326 (citing *Belton*, 318 N.C. at 162, 347 S.E.2d at 768). An erroneous instruction, however, does not warrant automatic reversal; rather, a showing of prejudice is still required. *Malachi*, 371 N.C. at 736, 821 S.E.2d at 420. Importantly, "the history of this Court's decisions in cases involving the submission of similar erroneous instructions and out consistent insistence that jury verdicts concerning a defendant's guilt or innocence have an adequate evidentiary foundation persuade us that instructional errors like the one at issue in this case are exceedingly serious and merit close scrutiny to ensure there is *no 'reasonable possibility'* that the jury convicted the defendant on the basis of such an unsupported legal theory." *Id.* "However, in the event that the State present exceedingly strong evidence of defendant's guilt on the basis of a theory that has sufficient support and the State's evidence is neither in dispute nor subject to serious credibility-related questions, it is

unlikely that a reasonably jury would elect to convict the defendant on the basis of an unsupported legal theory." *Id.*

The State's evidence is not so exceedingly strong here. Although Assault with a Deadly Weapon with Intent to Kill and Firing Into an Occupied Dwelling were properly submitted the jury, Discharging a Firearm Within an Occupied Vehicle, under a plain reading of that statute, was not. We cannot discern upon which theory or theories the jury based its verdict. Moreover, the State's evidence in this case is certainly in dispute. First, with respect to the AWDWWIK charge, while there is sufficient evidence to submit the charge to the jury, it would not be unreasonable for a jury to find Defendant lacked the requisite specific intent for that offense. Several witnesses testified to seeing Defendant shooting from the car; however, no witness testified Defendant aimed in a particular direction. Although a jury could infer Defendant intended to shoot someone in the group, it would be just as reasonable to infer Defendant did not intend to hit anyone in particular and thus lacked the specific intent necessary for AWDWWIK.

Likewise, there is no evidence beyond the bullet hole in the house that Defendant intentionally shot at or aimed for the Turner's house. While a jury would be entitled to infer intent from the fact of a bullet entering the house, it would just as well be entitled to conclude Defendant lacked the requisite intent without more specific evidence to support the theory he meant to hit the house. Further, as

Defendant argued in his Motion to Dismiss, the State's only evidence as to the age of the bullet hole in the house was Detective Snow's testimony stating "there's no pollen. There's no dirt. It's a very clean line like it had been freshly broken." Detective Snow also testified, however, that there were two other holes in the siding of the house. The lack of dirt or pollen was the only thing Detective Snow cited as differentiating the three holes. Further, there was no testimony from the homeowner or any other witness establishing any of the holes in the house had not been there prior to the incident in this case. To be clear, although there is sufficient evidence to submit the AWDWWIK and Firing Into an Occupied Dwelling charges to the jury, there is also enough uncertainty, evidentiary disputes, and room for disparate inferences that reasonable jurors may have concluded Defendant lacked the intent required for either of those offenses and thus relied solely upon the impermissible charge.

I encourage the Supreme Court of North Carolina to review Section 14-34.10 and determine if it criminalizes the conduct at issue in this case: firing a weapon from one enclosure into another. If it does not, I would remand this case for a new trial in which the State may not submit Discharging a Firearm Within an Occupied Vehicle as a predicate felony for Felony Murder.

No. COA24-538 – *State v. Hardaway*

DILLON, Chief Judge, concurring.

I concur. Defendant argues the language of G.S. 14-34.10 does not cover his actions, firing a weapon "from within" a vehicle at targets outside the vehicle, as shown by the evidence, where the language of the statute merely proscribes firing a weapon "within" a vehicle. *See State v. Hinton*, 361 N.C. 207, 211–12 (2007) (under the "rule of lenity" ambiguous statutes are to be strictly construed against the State). We are bound, though, by our Court's recent holding in *State v. Jenkins* that G.S. 14-34.10 is not ambiguous, that our General Assembly also intended to proscribe the firing of a weapon *from* within a vehicle at a target outside the vehicle.

Defendant further argues the lack of evidence that he committed *any* of the predicate felonies submitted to the jury. I agree, though, with the majority opinion that the evidence was sufficient to submit the predicate felonies to the jury.

I write separately to express my view that G.S. 14-34.10 should not have been submitted to the jury, but for a reason not argued by Defendant either at trial or on appeal. While based on *Jenkins* I am compelled to disagree with Defendant's argument that there was insufficient evidence he violated G.S. 14-34.10, I conclude the circumstances surrounding his violation of that felony were not sufficient to bring those actions within the purview of our felony murder statute, as Defendant's presence in a car when he fired the fatal shot did not add any risk of harm, as explained below.

Under our felony murder statute, a defendant is guilty of *first-degree* murder if his commission of "arson, rape or a sex offense, robbery, kidnapping, burglary, *or any other felony committed or attempted with the use of a deadly weapon*" is a cause of a bystander's death. N.C.G.S. § 14-17 (2023) (emphasis added). The italicized language (hereinafter the "deadly weapon provision") was added in 1977.

Our Supreme Court has construed "other felony" within the deadly weapon provision to "refer to any felony which 'creates any substantial foreseeable human risk and actually results in the loss of life.'" *State v. Wall*, 304 N.C. 609, 614 (quoting *State v. Thompson*, 280 N.C. 202, 211 (1972)). In *Wall*, the Court held that a different assault-type felony—specifically the firing of a weapon into an occupied vehicle—*could* serve as the predicate felony in a felony murder conviction. *Id.* at 615. However, I do not believe the Court intended for the felony murder statute to apply in *every* case where a defendant has violated that statute, for instance where the defendant fires at his target while his target is sitting in a parked car. The felony murder statute was triggered in *Wall* in my view because, in that case, the vehicle which the defendant fired into *was in motion*, which created additional "substantial foreseeable human risk" beyond the firing of the weapon.

There may be situations where evidence of a violation G.S. 14-34.10 could support a felony murder conviction based on *Wall*. For instance, evidence that a defendant in a car fires a gun indiscriminately at others within the same car, where

the car is locked and potential victims cannot easily escape, may support a felony murder conviction, as the confined space of both the victim and the shooter creates an additional risk beyond the assault itself.  However, the evidence in this case, the fact Defendant was in a car when he fired his weapon outside his vehicle *did not add* any risk to human life beyond the assault itself.  Rather, based on the evidence in the light most favorable to the State, the only risk to human life in his commission of G.S. 14-34.10 was his firing of the gun.

With that said, I write further to express my doubts our General Assembly intended for G.S. 14-34.10 or similar assault-type felonies to ever serve as predicate felonies.  That body has already prescribed a series of crimes to punish fatal assaults, the levels of which are differentiated by the shooter's intent.  *See Lutz v. Gaston County*, 282 N.C. 208, 219 (1972) ("Statutes dealing with the same subject matter must be construed *in para materia*, and harmonized, if possible, to give effect to each." (italics added) (citation omitted)).  Since the main gist of G.S. 14-34.10 is the firing of the weapon itself, Defendant should be convicted based on his intent when he fired the weapon.

For instance, under G.S. 14-17(a), if the jury finds a defendant who fatally shoots another from a car with the specific intent to kill *and* that intent is formed after premeditation and deliberation, he would be guilty of first-degree murder.

Under that same statute, if it had been found he intentionally fatally shoots the victim with malice, but it is not shown he had the specific intent *to kill* her, he would be guilty only of second-degree murder.

And under G.S. 14-18, if he fatally shoots a victim in the heat of passion—even with the specific intent to kill—he would merely be guilty of voluntary manslaughter. *See State v. Huggins*, 338 N.C. 494, 497-98 (1994) (holding that a level of provocation can "negate[] malice and reduce[] murder to voluntary manslaughter"); *State v. Misenheimer*, 304 N.C. 108, 114 (1981) ("If, however, the killing was the product of a specific intent to kill formed under the influence of [intense, sudden] provocation[,] then there would be no deliberation and hence no murder in the first degree.").

Also, he would only be guilty of voluntary manslaughter under G.S. 14-18 if he fatally shoots his victim, even with the intent to kill, but acted in "imperfect self-defense". *State v. Lyons*, 340 N.C. 646, 661 (1995) (a defendant is guilty of voluntary manslaughter if found to be otherwise justified in the shooting except *either* that he "was the aggressor in bringing on the affray *or* used excessive force").

Under this same section, if he fatally shoots his victim accidentally, but acts with culpable negligence, he is guilty only of involuntary manslaughter. *See*, *e.g.*, *State v. Fritsch*, 351 N.C. 373, 380 (2000).

Finally, if he fatally shoots, even with the specific intent to kill, but has acted in perfect self-defense, he would not be guilty of any crime. *See State v. Harvey*, 372 N.C. 304, 307–08 (2019).

So, for the situation where both a shooter and his victim are in the same confined vehicle but where the shooter was merely being reckless in firing his weapon, perhaps the appropriate crime is second-degree murder. Or if he gets in a car and discovers his wife in the back seat of the car with a paramour and shoots his wife, perhaps the appropriate crime is voluntary manslaughter.

Application of *ejusdem generis* is appropriate for construing the deadly weapon provision. *Ejusdem generis* is a canon of statutory construction which provides "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (cleaned up) (citations omitted). Earlier this year, our Supreme Court applied this canon to hold the phrase "claims for loss" under the federal PREP Act did not include state constitutional claims, illustrating the canon as follows:

> [A] football league might adopt a rule that players must not "grab, twist, or pull a facemask, helmet, or other equipment with the intent to injure a player, or otherwise attack, assault, or harm any player." If a linebacker shouts insults at the quarterback and hurts his feelings, has the linebacker nonetheless followed the rule? Of course he has. The examples of prohibited actions all concern dangerous

> physical conduct that might inflict bodily harm; trash talk
> is simply not of that kind.

*Happel v. Guilford Cnty. BOE*, 387 N.C. 186, 209 (2025) (quoting *Fischer*, 603 U.S. at 488). The Court explained that application of the canon in that case "track[s] the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Id.* (citation omitted).

Our Supreme Court also applied *ejusdem generis* in construing "other officer" in a statute only to include county officers where the phrase followed a list of job titles, each of which was a county-level officer. *Wynn v. Frederick*, 385 N.C. 576, 582–83 (2023). The Court cited other opinions where it applied *ejusdem generis* to discern our General Assembly's intent. *See Meyer v. Walls*, 347 N.C. 97, 106 (1997) ("Where words of general enumeration follow those of specific classification, the general words will be interpreted to fall within the same category as those previously designated."); *Turner v. Bd. of Educ.*, 250 N.C. 456, 463 (1959)(same); *State v. Lee*, 277 N.C. 242, 244 (1970) ("[G]eneral words [that] follow a designation of particular subjects or things . . . includ[e] only things of the same kind, character and nature as those specifically enumerated."); *State v. Fenner*, 263 N.C. 694, 697-98 (1965) (same).

It is clear our General Assembly intended to elevate an arson, rape, sex offenses, robbery, burglary, or kidnapping which result in a death to *first-degree* murder, irrespective of whether a deadly weapon was used. These crimes clearly each involve an act beyond carrying out the desire to physically harm someone. Arson

involves burning a dwelling house; rape and sex offenses involve committing an unwanted sex act; robbery involves stealing from someone by force; burglary involves breaking into someone's home at night; and kidnapping involves confining, restraining or removing someone for some felonious purpose. And I believe by enacting the deadly weapon provision our General Assembly intended to elevate similar-type, but lesser felonies—those involving some other risky component besides or in addition to an assault—where the defendant uses a deadly weapon to carry it out; for instance, felony burning of a non-dwelling (in addition to arson), felony indecent liberties (in addition to rape and sexual offense), felony breaking and entering (in addition to burglary), felonious restraint (in addition to kidnapping), felony larceny (in addition to robbery), and the like, which result in a death to first-degree murder, but only where the defendant uses a firearm.

In that vein, I believe there is a strong argument that it was not appropriate to submit the crime of assault with a deadly weapon with the intent to kill ("AWDWIK") as a predicate felony, notwithstanding the sufficiency of the evidence that Defendant committed this crime. That is, I have doubts that AWDWIK should ever serve as an underlying felony for a felony murder conviction, based on the doctrine of transferred intent.

For well over a century and as late as 2020 (well before and well after our General Assembly added the deadly weapon provision in 1977), our Supreme Court

has instructed that a shooter is "guilty or innocent *exactly as though the fatal act had caused the death of the person intended to be killed.* The intent is transferred to the person whose death has been caused." *State v. Greenfield*, 375 N.C. 434, 441 (2020) (quoting *State v. Dalton*, 178 N.C. 779, 781 (1919)) (emphasis added). That is, the shooter's intent "follows the bullet":

> It is an accepted principle of law that where one is engaged in an affray with another and unintentionally kills a bystander or a third person, *his act shall be interpreted with reference to his intent and conduct towards his adversary.* Criminal liability, if any, and the degree of homicide must be thereby determined. Such a person is guilty or innocent exactly as if the fatal act had caused the death of his adversary. It has been aptly stated that the malice or intent follows the bullet.

*State v. Davis*, 349 N.C. 1, 37 (1998) (cleaned up) (emphasis added).

Under these holdings, if one shoots at another with the specific intent to kill formed after premeditation and deliberation, but inadvertently kills a bystander, the shooter is still guilty of first-degree murder, even though he had no intent to kill the bystander. If, however, he shoots at another in perfect self-defense, but inadvertently kills a third party, the shooter would entitled to an instruction on perfect self-defense to avoid any criminal culpability. *Id.*

As explained by our Supreme Court, if one intends to shoot another with malice without the specific intent to kill, but inadvertently kills a bystander, he would be

guilty of second-degree murder; or if he shoots at another intending to kill in the heat of passion, but hits a third party, he would only be guilty of manslaughter:

> if the killing of the intended victim would have been reduced by the circumstances to murder in the second [] degree, or to manslaughter in any of the degrees, then the unintended and accidental killing of the bystander resulting from any act designed to take effect upon the intended victim would be likewise reduced to the same grade of offense as would have followed the death of the victim intended to be killed.

*Dalton*, 178 N.C. at 782. *See also State v. Locklear*, 331 N.C. 239, 245 (1992) (explaining that a defendant's criminal liability for the shooting death of an unintended victim is determined as if he had killed his intended victim).

Our Supreme Court, however, on occasion has held that AWDWIK may serve as a predicate felony where someone other than the defendant's intended target is killed." *State v. Abraham*, 338 N.C. 315, 332 (1994) (holding felony assault with a deadly weapon which results in the death of a bystanding supports conviction of first-degree felony murder). This appears to be true even if the shooter only had the "intent to inflict serious injury" on the intended target but kills a bystander. *State v. Jones*, 353 N.C. 159, 168 (2000).

The Court in *Abraham* reasoned it was not reversible error *not* to give a "transferred intent" instruction in that case since the jury necessarily found anyway that the defendant specifically intended to kill someone when he inadvertently killed a bystander. *Abraham*, 338 N.C. at 332. While this reasoning may have been sound

based on the facts of that case, I do not believe it is not sound in every AWDWIK case, as "malice" is *not* an element of AWDWIK. *See State v. Hall*, 59 N.C. App. 567, 573 (1982). Consider a classic example of voluntary manslaughter where a husband, coming back from hunting, as he is carrying his gun to his garage, sees his wife in their bed with another man. If the jury finds the husband, in the heat of passion, fatally shoots his wife with the specific intent to kill her, he is guilty of voluntary manslaughter. However, if the husband misses his wife and kills her paramour, it seems logical under the greater weight of Supreme Court precedent he would still be guilty of only voluntary manslaughter, based on transferred intent. But, under *Abraham*, it seems he could be held criminal liable for first-degree murder because he killed his paramour while committing the crime of AWDWIK against his wife, though without malice. I believe, however, it is more appropriate to convict a defendant who kills a bystander while committing AWDWIK based on transferred intent where there is evidence of a lack of malice rather than for first-degree murder.